# POINDEXTER v. GREENHOW, Treasurer.

## IN ERROR TO THE HUSTINGS COURT OF THE CITY OF RICHMOND, STATE OF VIRGINIA.

In an action of detinue for personal property, distrained by the defendant for delinquent taxes, in payment of which the plaintiff had duly tendered coupons cut from bonds issued by the State of Virginia under the Funding Act of March 30, 1871: *Held,*

1. That by the terms of that act, and the issue of bonds and coupons in virtue of the same, a contract was made between every coupon-holder and the State that such coupons should "be receivable at and after maturity for all taxes, debts, dues, and demands due the State;" the right of the coupon-holder, under which, was to have his coupons received for taxes when offered, and that any act of the State which forbids the receipt of these coupons for taxes is a violation of the contract, and void as against coupon-holders.

2. The faculty of being receivable in payment of taxes was of the essence of the right. It constituted a self-executing remedy in the hands of a tax-payer, and it became thereby the legal duty of every tax collector to receive such coupons, in payment of taxes, upon an equal footing and with equal effect, as though they were money; after a tender of such coupons duly made for that purpose, the situation and rights of the tax-payer and coupon-holder were precisely what they would have been if he had made a like tender in money.

3. It is well settled by many decisions of this court that, for the purpose of affecting proceedings to enforce the payment of taxes, a lawful tender of payment is equivalent to actual payment, either being sufficient to deprive the collecting officer of all authority for further action, and making every subsequent step illegal and void.

4. The coupons in question are not "bills of credit," in the sense of the Constitution, which forbids the States to "emit bills of credit;" because although issued by the State of Virginia on its credit, and made receivable in payment of taxes, and negotiable, so as to pass from hand to hand by delivery merely, they were not intended to circulate as money between individuals, and between government and individuals, for the ordinary purposes of society.

5. An action or suit brought by a tax-payer, who has duly tendered such coupons in payment of his taxes, against the person who, under color of office as tax collector, and acting in the enforcement of a void law, passed by the Legislature of the State, having refused such tender of coupons, proceeds by seizure and sale of the property of the plaintiff, to enforce the collection

Syllabus in Poindexter v. Greenhow.

of such taxes, is an action or suit against him personally as a wrong-doer, and not against the State, within the meaning of the Eleventh Amendment to the Constitution of the United States.

6. Such a defendant, sued as a wrong-doer, who seeks to substitute the State in his place, or to justify by the authority of the State, or to defend on the ground that the State has adopted his act and exonerated him, cannot rest on the bare assertion of his defence, but is bound to establish it; and, as the State is a political corporate body, which can act only through agents, and command only by laws, in order to complete his defence, he must produce a valid law of the State, which constitutes his commission as its agent, and a warrant for his act.

7. The act of the General Assembly of Virginia of January 26, 1882, "to provide for the more efficient collection of the revenue to support government, maintain the public schools, and to pay interest on the public debt," requiring tax collectors to receive in discharge of the taxes, license taxes, and other dues, gold, silver, United States treasury notes, national bank currency, and nothing else, and thereby forbidding the receipt of coupons issued under the act of March 30, 1871, in payment therefor, although it is a legislative act of the government of Virginia, is not a law of the State of Virginia, because it impairs the obligation of its contract, and is annulled by the Constitution of the United States.

8. The State has passed no such law, for it cannot; and what it cannot do, in contemplation of law, it has not done. The Constitution of the United States, and its own contract, both irrepealable by any act on its part, are the law of Virginia, and that law made it the duty of the defendant to receive the coupons tendered in payment of taxes, and declared every step to enforce the tax thereafter taken to be without warrant of law, and therefore a wrong. This strips the defendant of his official character, and convicts him of a personal violation of the plaintiff's rights, for which he must personally answer.

9. It is no objection to the remedy in such cases, that the statute, the application of which in the particular case is sought to be prevented, is not void on its face, but is complained of only because its operation in the particular instance works a violation of a constitutional right, for the cases are numerous where the tax laws of a State, which in their general and proper application are perfectly valid, have been held to become void in particular cases, either as unconstitutional regulations of commerce, or as violations of contracts prohibited by the Constitution, or because in some other way they operate to deprive the party complaining of a right secured to him by the Constitution of the United States.

10. In cases of detinue the action is purely defensive on the part of the plaintiff. Its object is merely to resist an attempted wrong and to restore the status in quo as it was when the right to be vindicated was invaded. It is analogous to the preventive remedy of injunction in equity when that jurisdiction is invoked, of which frequent examples occur in cases to prevent the illegal taxation of national banks by State authorities.

11. The suit authorized by the act of the General Assembly of Virginia of Jan-

Syllabus in Poindexter v. Greenhow.

uary 26, 1882, against the collector of taxes, refusing to accept a tender of coupons, to recover back the amount paid under protest, is no remedy at all for the breach of the contract, which required him to receive the coupons in payment. The tax-payer and coupon-holder has a right to say he will not pay the amount a second time, and, insisting upon his tender as equivalent to payment, to resist the further exaction, and treat as a wrong-doer the officer who seizes his property to enforce it.

12. Neither can it be considered an adequate remedy, in view of the supposed necessity for summary proceedings in matters of revenue, and the convenience of the State, which requires that the prompt collection of taxes should not be hindered or embarrassed ; for the revenue system must yield to the contract which the State has lawfully made, and the obligation of which, by the Constitution, it is forbidden to impair.

13. The right to pay in coupons cannot be treated as a mere right of set-off, which is part of the remedy merely, when given by the general law, and therefore subject to modification or repeal, because the law which gave it is also a contract, and therefore cannot be changed without mutual consent.

14. The acts of the General Assembly of Virginia of January 26, 1882, and the amendatory act of March 13, 1884, are unconstitutional and void, because they impair the obligation of the contract of the State with the coupon-holder under the act of March 30, 1871 ; and that being the main object of the two acts, the vice which invalidates them pervades them throughout, and in all their provisions. It is not practicable to separate those parts which repeal and abolish the actions of trespass, and trespass on the case, and other particular forms of action, as remedies for the tax-payer, who has tendered his coupons in payment of taxes, from the main object of the acts, which that prohibition was intended to effectuate ; and it follows that the whole of these and similar statutes must be declared to be unconstitutional, null and void. It also follows, that these statutes cannot be regarded in the courts of the United States as laws of the State, to be obeyed as rules of decision in trials at common law, under § 721 Rev. Stat., nor as regulating the practice of those courts, under § 914 Rev. Stat.

15. The present case is not covered by the decision in Antoni v. Greenhow, 107 U. S. 769, the points now involved being expressly reserved in the judgment in that case.

*Mr. William L. Royall*, *Mr. Daniel H. Chamberlain* [*Mr. William B. Hornblower* was with him on the brief], *Mr. Wager Swayne*, and *Mr. William M. Evarts* for plaintiff in error.

*Mr. F. S. Blair*, Attorney General of the State of Virginia, *Mr. Richard T. Merrick* and *Mr. Attorney General* for defendant in error.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The plaintiff in error, who was also plaintiff below, brought his action in detinue on the 26th day of April, 1883, against Samuel C. Greenhow, for the recovery of specific personal property, to wit, one office desk of the value of thirty dollars, before a police justice in the City of Richmond, who dismissed the same for want of jurisdiction. An appeal was taken by the plaintiff to the Hustings Court for the City of Richmond, where the facts were found by agreement of parties to be as follows: That the plaintiff was a resident of the City of Richmond in the State of Virginia; that he owed to the State of Virginia, for taxes on property owned by him in said city for the year 1882, twelve dollars and forty-five cents, which said taxes were due and leviable for, under the laws of Virginia, on the 1st day of December, 1882; that the defendant Samuel C. Greenhow, was the treasurer of the City of Richmond, and as such is charged by law with the duty of collecting taxes due to the State of Virginia by all residents of said city; that on the 25th day of April, 1883, the defendant, as such treasurer and collector of taxes, made upon the plaintiff demand for the payment of the taxes due by him to the State as aforesaid; that the plaintiff, when demand was so made for payment of his taxes, tendered to the defendant in payment thereof forty-five cents in lawful money of the United States, and coupons issued by the State of Virginia under the provisions of the act of the General Assembly of that State of March 30, 1871, entitled "An Act to provide for the funding and payment of the public debt;" that said coupons so tendered by plaintiff were all due and past maturity, and amounted in the aggregate to twelve dollars, and were all cut from bonds issued by the said State of Virginia, under the provisions of the said act of March 30, 1871; that the said coupons and money so tendered by the plaintiff amounted together to exactly the sum so due the State by the plaintiff for taxes; that the defendant refused to receive the said coupons and money so tendered in payment of the plaintiff's taxes; that the defendant, after said tender was made, as he deemed himself required to do by the acts of Assembly of Virginia, entered the plaintiff's place of business in said city.

and levied upon and took possession of the desk, the property of the plaintiff, now sued for, for the purpose of selling the same to pay the taxes due from him ; and that the said desk is of the value of thirty dollars, and still remains in possession of the defendant for the purpose aforesaid, he having refused to return the same to the plaintiff on demand.

The Hustings Court was of the opinion that the police justice erred in deciding that he had no jurisdiction, and that the issue in the action might have been tried by him, and that it should be tried by that court on the appeal ; but it was also of the opinion that in tendering to the defendant, as part of the tender in payment of the plaintiff's taxes, the coupons mentioned and described, the plaintiff did not tender what the law required, nor what the defendant was, as treasurer, obliged to or should have received in payment of the plaintiff's taxes, under the provisions of the act of the General Assembly of Virginia, approved January 26, 1882, entitled "An act to provide for the more efficient collection of the revenue to support government, maintain the public schools, and to pay interest on the public debt ;" that the plaintiff's remedy for the failure of the defendant, as treasurer, to receive coupons in payment of taxes, was to be found in the provisions of said act of January 26, 1882 ; and that, therefore, the defendant does not unlawfully or wrongfully detain the plaintiff's property levied on by the defendant, as treasurer of the City of Richmond, for the plaintiff's taxes ; and judgment was accordingly rendered for the defendant.

It appears from the record that there was drawn in question the validity of the said act of the General Assembly of Virginia, approved January 26, 1882, and of the 18th section of the act of the General Assembly of the State of Virginia, approved April 1, 1879, which authorizes the collection of delinquent taxes by distraint of personal property, upon the ground that these acts are repugnant to section 10 of Article 1 of the Constitution of the United States, which declares that no State shall pass any law impairing the obligation of contracts, the judgment of the court being in favor of the validity of said acts and against the rights claimed by the plaintiff under the

Constitution of the United States. The Hustings Court is the highest court of the State to which the said cause could be taken.

The act of January 26, 1882, the validity of which is thus questioned, is as follows:

"*Be it enacted by the General Assembly of the State of Virginia,* That the several tax collectors of this Commonwealth shall receive, in discharge of the taxes, license taxes and other dues, gold, silver, United States treasury notes, national bank currency, and nothing else; provided that in all cases in which an officer charged by law with the collection of revenue due the State, shall take any steps, for the collection of same, claimed to be due from any citizen or tax-payer, such person against whom such step is taken, if he conceives the same to be unjust or illegal, or against any statute, or to be unconstitutional, may pay the same under protest, and under such payment the officer collecting the same shall pay such revenue into the State treasury, giving notice at the time of such payment to the treasurer that the same was paid under protest. The person so paying such revenue may, at any time within thirty days after making such payment, and not longer thereafter, sue the said officer so collecting such revenue in the court having jurisdiction of the parties and amounts.

"If it be determined that the same was wrongfully collected, for any reason going to the merits of the same, then the court trying the case may certify of record that the same was wrongfully paid and ought to be refunded; and, thereupon, the auditor of public accounts shall issue his proper warrant for the same, which shall be paid in preference to other claims on the treasury, except such as have priority by constitutional requirement.

"There shall be no other remedy in any case of the collection of revenue, or the attempt to collect revenues illegally, or the attempt to collect revenue in funds only receivable by said officers under this law, the same being other and different funds than the tax-payer may tender or claim the right to pay, than such as are herein provided; and no writ for the prevention of any revenue claim, or to hinder or delay the collection

of the same, shall in anywise issue, either injunction, *superse-deas,* *mandamus,* prohibition, or any other writ or process whatever; but in all cases, if, for any reason, any person shall claim that the revenue so collected of him was wrongfully or illegally collected, the remedy for such person shall be as above provided and in no other manner. In all such cases, if the court certify of record that the officer defendant acted in good faith and diligently defended the action, the necessary costs incurred by him shall be taxed to and paid by the State, as in criminal cases. The commonwealth attorney for the county or corporation in which suit is brought shall appear and represent the defence. In every case where judgment is rendered for the defendant, a fee of five dollars shall be taxed in favor of said attorney and against the plaintiff, and whenever the court shall refuse to certify the good faith and diligence of the officer defending the case, a like fee of five dollars shall be taxed against said officer. Any officer charged with the collection of revenue, who shall receive payment thereof in anything other than that hereinbefore provided, shall be deemed guilty of a misdemeanor, and fined not less than one hundred nor more than five hundred dollars, in the discretion of the court; but nothing herein contained shall be construed to subject any officer of the State to any suit, other than as hereinbefore provided, for any refusal on his part to accept in payment of revenue due the State any kind or description of funds, security or paper not authorized by this act.

"2. This act shall be in force from and after the first day of December, eighteen hundred and eighty-two."

§ 18 of the Act of April 1, 1879, Acts of 1878–79, p. 318, so far as material, is, that "It shall be the duty of the treasurer, after the first day of December, to call upon each person chargeable with taxes and levies, who has not paid the same prior to that time, or upon the agent of such person resident within the county or corporation, and, upon failure or refusal of such person or agent to pay the same, he shall proceed to collect by distress or otherwise." Goods and chattels distrained by an officer, by provisions of other statutes then in force, were required to be sold at public sale after due notice, as prescribed.

The Act of January 26, 1882, was amended by an act which was passed and took effect March 13, 1884, by the addition of the following sections:

"§ 2. Whenever any papers purporting to be coupons cut from bonds of this State, shall be tendered to the collecting officer in payment of any taxes due to the State by any party desiring to bring a suit under this statute, it shall be the duty of the collecting officer to place the coupons so tendered in an envelope, to seal the said envelope, write his name across the seal thereof, endorse it with the numbers of the coupons enclosed, and return it to the tax-payer. Upon the trial of any proceeding under this act, the said coupons, inclosed in the said envelope so sealed and endorsed, must be produced in evidence to prove the tender. If the court shall certify that the money paid under protest ought to be refunded, the said coupons shall be delivered to the auditor of public accounts, to be cancelled simultaneously with the issue of his warrant.

"§ 3. No action of trespass or trespass on the case shall be brought or maintained against any collecting officer for levying upon the property of any tax-payer who may have tendered in payment, in whole or in part, any coupon, or paper purporting to be a coupon, cut from bonds of this State for such taxes, and who shall refuse to pay his taxes in gold, silver, United States treasury notes, or national bank notes. The suit contemplated by this act shall be commenced by a petition filed at rules, upon which a summons shall be issued to the collecting officer; and the said suit shall be regularly matured like other actions at law, and the coupons tendered shall be filed with said petition."

The contract which the plaintiff in error alleges has been violated is with the State of Virginia, and is contained in the act of March 30, 1871, known as the Funding Act, entitled "An Act to provide for the funding and payment of the public debt," and in the bonds and coupons issued under its authority. It provided for the funding of two-thirds of the existing State debt and of two-thirds of the interest accrued thereon to July 1, 1871, in new six per cent. bonds, to run thirty-four years, the bonds, coupon or registered, payable to

order or bearer, and the coupons to bearer, and declared that the coupons should be payable semi-annually and " be receivable at and after maturity for all taxes, debts, dues and demands due the State," and that this should be expressed on their face. For the remaining one-third, certificates were to be issued to the creditors to hold as claims against the State of West Virginia, that being assumed as her just proportion of the entire debt. " Under this act," it was said by this court, in *Hartman* v. *Greenhow*, 102 U. S. 672, 679, " a large number of the creditors of the State, holding bonds amounting, including interest thereon, to about thirty millions of dollars, surrendered them and took new bonds with interest coupons annexed for two-thirds of their amount and certificates for the balance. A contract was thus consummated between the State and the holders of the new bonds and the holders of the coupons, from the obligation of which she could not, without their consent, release herself by any subsequent legislation. She thus bound herself, not only to pay the bonds when they became due, but to receive the interest coupons from the bearer at and after their maturity, to their full amount, for any taxes or dues by him to the State. This receivability of the coupons for such taxes and dues was written on their face, and accompanied them into whatever hands they passed. It constituted their chief value, and was the main consideration offered to the holders of the old bonds to surrender them and accept new bonds for two-thirds of their amount."

The same view had been taken by the Supreme Court of Appeals of Virginia, in the cases of *Antoni* v. *Wright*, 22 Grattan, 833, *Wise* v. *Rogers*, 24 Grattan, 169, and *Clarke* v. *Tyler*, 30 Grattan, 134, in the last of which cases it was declared to be the settled law of the State. It was repeated by this court in *Antoni* v. *Greenhow*, 107 U. S. 769, where it was said, p. 775, " The right of the coupon-holder is to have his coupon received for taxes when offered," and, page 771, " Any act of the State which forbids the receipt of these coupons for taxes is a violation of the contract, and void as against coupon-holders." Upon these propositions, there was an entire agreement between the majority and minority of the court in that case.

The nature and value of this contract right to the coupon-holder deserve to be further explained. It was evidently a part of the consideration on which the creditors of the State were induced to accept, under the act of March 30, 1871, from the State of Virginia, new obligations for two-thirds of their claim, in exchange for the surrender of the original bonds. The latter depended for their payment, as to both principal and interest, upon the continued good faith of the State in making, from time to time, necessary appropriations out of the public treasury, to meet its recurring liabilities, by positive legislation to that effect. In case of default, there was no remedy by legal process. The State itself could not be sued. Its bare promises to pay had no sanction but the public sense of duty to the public creditors. The only security for their performance was the public faith.

But immediately on the passage of the act of March 30, 1871, and thereafter, occasional or continued default in the payment of interest on the bonds issued in pursuance of its provisions, by reason of failures to provide by laws necessary appropriations for its payment, was met, if not obviated, by a self-executing remedy lodged by the law in the hands of the creditor himself. For, from that time it became the legal duty of every tax collector to receive coupons from these bonds, offered for that purpose by tax-payers, in payment of taxes, upon an equal footing, at an equal value, and with equal effect, as though they were gold or silver or legal-tender treasury notes. They were by that act reduced, in effect, into money, and, as between the State and its tax-payers, were a legal tender as money. And, being not only a law, but a contract, it became, by force of the Constitution of the United States, irrepealable, and therefore is to-day, what it was when first enacted, the unchangeable law of Virginia. After a tender of such coupons by a tax-payer in payment of taxes, and a refusal by a tax collector to receive them, the situation and rights of the tax-payer and coupon-holder were precisely what they would have been if he had made a like tender in gold coin and it had been refused. What they would be we shall have occasion presently to inquire. In the meantime, it is clear that the con-

tract obligation embodied in the quality imparted by law to these coupons, of being receivable in payment of taxes, is a distinct, collateral, and real security, placed in the hands of the creditor, intended to enable him to collect them without process of law. As long as the annual taxes of the State are sufficient in amount to absorb all coupons that are overdue and unpaid, a certain market is created for them which will maintain them at or near their par value. In the hands of the tax-payer who buys them for tender, they are practically no longer *choses in action,* but equal in value and quality to money, and equivalent to receipts for taxes already paid.

At the time of the passage of the act of March 30, 1871, there existed a remedy by *mandamus,* in case a tax collector refused to receive the coupons, issued under that act, tendered in payment of taxes, to compel him specifically to do so. The case of *Hartman* v. *Greenhow,* 102 U. S. 672, was one in which that relief was administered; and in *Antoni* v. *Greenhow,* 107 U. S. 769, it is stated to have been the settled practice of the Supreme Court of Appeals of Virginia to entertain suits for similar relief. By an act of January 14, 1882, the General Assembly of that State modified the proceedings in *mandamus* in such cases so as to require the tax-payer first to pay his taxes in money, and then the coupons tendered having, in another proceeding, been determined to be genuine, he was entitled to a judgment upon the *mandamus,* requiring them to be received in payment of the taxes, and the money previously paid refunded. The validity of this act became the question in *Antoni* v. *Greenhow, ubi supra,* and it was affirmed on the ground that, for the purpose of specifically enforcing the right to have the coupons received in payment of taxes, the new remedy was substantially equivalent to the old one. The court were not willing to decide that it was a suit against the State, in which the mode of proceeding could be modified, or the remedy taken away altogether, at the pleasure of the State. And it affirmed the right of the coupon-holder to have his coupon received for taxes when offered. "The question here," said the court, "is not as to that right, but as to the remedy the holder has for its enforcement when denied." "The ques-

tion," said the Chief Justice, delivering the opinion of the court, "we are now to consider is not whether, if the coupon tendered is in fact genuine and such as ought, under the contract, to be received, and the tender is kept good, the treasurer can proceed to collect the tax by distraint or such other process as the law allows, without making himself personally responsible for any trespass he may commit, but whether the act of 1882 violates any implied obligation of the State in respect to the remedies that may be employed for the enforcement of its contract, if the collector refuses to take the coupon."

That was a case in which it was sought, by *mandamus*, specifically to enforce the contract of the State with the coupon-holder, by compelling, by affirmative action and process of law, the collector actually to receive the coupons tendered in satisfaction of taxes. It left unaffected the right of the coupon-holder and tax-payer, after his tender had been unlawfully refused, to stand upon his contract and the law, in defence of his rights, both of person and property, against all unlawful assaults and seizures. In the former he was an actor, seeking affirmative relief, to compel the specific performance of the contract. In the latter he is a defendant, passively resting on his rights, and resisting only demands and exactions sought to be enforced against him in denial of them. He has himself, in all things, performed the contract on his part, and obeyed the law, and simply insists, that if more is illegally exacted and taken from him, he shall have the remedy which the law gives to every other citizen, not himself in default, against the wrong-doer, who, under color of law, but without law, disturbs or dispossesses him. As we have seen, the coupon-holder, whose tender of genuine coupons in payment of taxes has been refused, stands upon the same footing, in this respect, as though he had tendered gold coin in similar circumstances and with like result

The question next in order is, whether he has any; and, if any, what remedy for the recovery of property distrained to pay the same tax which he has thus already offered and attempted to pay in money or its equivalent. It is well settled by many decisions of this court, that, for the purpose of affect-

ing proceedings to enforce the payment of taxes, a lawful ten-
der of payment is equivalent to actual payment, either being
sufficient to deprive the collecting officer of all authority for
further action, and making every subsequent step illegal and
void. In *Woodruff* v. *Trapnall*, 10 How. 190, 208, it was held
that a tender of the notes of the bank of the State of Arkan-
sas, by law and a contract with the note holders made receiva-
ble in payment of public dues to the State, was equivalent to
payment, in extinguishing the judgment in satisfaction of
which they were offered. The court said : "The law of tender
which avoids future interest and costs, has no application in
this case. The right to make payment to the State in this paper
arises out of a continuing contract, which is limited in time by
the circulation of the notes to be received. They may be
offered in payment of debts due to the State, in its own right,
before or after judgment, and without regard to the cause of
indebtment." In the case of *United States* v. *Lee*, 106 U. S.
196, it was held, that a certificate of a sale of land for taxes,
made by commissioners, which by law was impeachable by
proof that the taxes had been paid previous to sale, was
rendered void by proof that the commissioners had refused to
receive the taxes, without proof of an actual tender, where the
commissioners had waived it by a previous notice that they
would not accept it. In the opinion of the court it is said,
page 200 : "This court has in a series of cases established the
proposition, that where the commissioners refused to receive
such taxes, their action in thus preventing payment, was the
equivalent of payment in its effect upon the certificate of sale,"
citing *Bennett* v. *Hunter*, 9 Wall. 326 ; *Tacey* v. *Irwin*, 18
Wall. 549 ; *Atwood* v. *Weems*, 99 U. S. 183 ; and *Hills* v. *Ex-
change Bank*, 105 U. S. 319.

The case, then, of the plaintiff below is reduced to this. He
had paid the taxes demanded of him by a lawful tender. The
defendant had no authority of law thereafter to attempt to en-
force other payment by seizing his property. In doing so, he
ceased to be an officer of the law, and became a private wrong-
doer. It is the simple case in which the defendant, a natural
private person, has unlawfully, with force and arms, seized,

taken and detained the personal property of another. That an action of detinue will lie in such a case, according to the law of Virginia, has not been questioned. The right of recovery would seem to be complete, unless this case can be met and overthrown on some of the grounds maintained in argument by counsel for the defendant in error. These we proceed now to examine in their order.

It is objected, in the first place, that the law and contract, by which the quality of being receivable in payment of taxes to the State is imputed to the coupons, is itself in violation of that clause of the Constitution of the United States, Art. I, sec. 10, which declares that no State shall "emit bills of credit," and is therefore void.

The coupons in question are in the ordinary form, and one of them reads as follows:

"Receivable at and after maturity for all taxes, debts and demands due the State.

"The Commonwealth of Virginia will pay the bearer thirty dollars interest due 1st January, 1884, on bond No. 2731.

"Coupon No. 20.

"GEO. RYE, *Treasurer*"

It is contended that this is a bill of credit in the sense of the Constitution, because, being receivable in payment of debts due the State and negotiable by delivery merely, it was intended to pass from hand to hand and circulate as money.

The meaning of the term "bills of credit," as used in the Constitution, has been settled by decisions of this court. By a sound rule of interpretation, it has been construed in the light of the historical circumstances which are known to have led to the adoption of the clause prohibiting their emission by the States, and in view of the great public and private mischiefs experienced during and prior to the period of the War of Independence, in consequence of unrestrained issues, by the Colonial and State governments, of paper money, based alone upon credit. The definition thus deduced was not founded on the abstract meaning of the words, so as to include everything in the

nature of an obligation to pay money, reposing on the public faith, and subject to future redemption, but was limited to those particular forms of evidences of debt, which had been so abused to the detriment of both private and public interests. Accordingly, Chief Justice Marshall, in *Craig* v. *Missouri*, 4 Pet. 410, 432, said, that "bills of credit signify a paper medium intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society." This definition was made more exact, by merely expressing, however, its implications, in *Briscoe* v. *The Bank of Kentucky*, 11 Pet. 257, 314, where it was said: "The definition, then, which does include all classes of bills of credit, emitted by the colonies or states, is a paper issued by the sovereign power, containing a pledge of its faith and designed to circulate as money." And again, p. 318, "To constitute a bill of credit, within the Constitution, it must be issued by a state, on the faith of the state, and be designed to circulate as money. It must be a paper which circulates on the credit of the state, and is so received and used in the ordinary business of life." The definition was repeated in *Darrington* v. *The Bank of Alabama*, 13 How. 12.

It is very plain to us that the coupons in question are not embraced within these terms. They are not bills of credit in the sense of this constitutional prohibition. They are issued by the State, it is true. They are promises to pay money. Their payment and redemption are based on the credit of the State, but they were not emitted by the State in the sense in which a government emits its treasury notes, or a bank its bank notes—a circulating medium or paper currency—as a substitute for money. And there is nothing on the face of the instruments, nor in their form or nature, nor in the terms of the law which authorized their issue, nor in the circumstances of their creation or use, as shown by the record, on which to found an inference that these coupons were designed to circulate, in the common transactions of business, as money, nor that in fact they were so used. The only feature relied on to show such a design or to prove such a use is, that they are made receivable in payment of taxes and other dues to the State. From this,

it is argued, that they would obtain such a circulation from hand to hand as money, as the demand for them, based upon such a quality, would naturally give. But this falls far short of their fitness for general circulation in the community, as a representative and substitute for money, in the common transactions of business, which is necessary to bring them within the constitutional prohibition against bills of credit. The notes of the Bank of the State of Arkansas, which were the subject of controversy in *Woodruff* v. *Trapnall,* 10 How. 190, were, by law, receivable by the State in payment of all dues to it, and this circumstance was not supposed to make them bills of credit. It is true, however, that in that case it was held they were not so because they were not issued by the State and in its name, although the entire stock of the bank was owned by the State, which furnished the whole capital, and was entitled to all the profits. In this case the coupons were issued by the State of Virginia and in its name, and were obligations based on its credit, and which it had agreed as one mode of redemption, to receive in payment of all dues to itself in the hands of any holder; but they were not issued as and for money, nor was this quality impressed upon them to fit them for use as money, or with the design to facilitate their circulation as such. It was conferred, as is apparent from all the circumstances of their creation and issue, merely as an assurance, by way of contract with the holder, of the certainty of their due redemption in the ordinary transactions between the State treasury and the taxpayers. They do not become receivable in payment of taxes till they are due, and the design, we are bound to presume, was that they would be paid at maturity. This necessarily excludes the idea that they were intended for circulation at all.

It is next objected, that the suit of the plaintiff below could not be maintained, because it is substantially an action against the State of Virginia, to which it has not assented. It is said, that the tax collector, who is sued, was an officer and agent of the State, engaged in collecting its revenue, under a valid law, and that the tax he sought to collect from the plaintiff was lawfully due; that, consequently, he was guilty of no personal wrong, but acted only in an official capacity, representing

the State, and, in refusing to receive the coupons tendered, simply obeyed the commands of his principal, whom he was lawfully bound to obey; and that if any wrong has been done, it has been done by the State in refusing to perform its contract, and for that wrong the State is alone liable, but is exempted from suit by the Eleventh Article of Amendment to the Constitution of the United States, which declares that " the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State."

This immunity from suit, secured to the States, is undoubtedly a part of the Constitution, of equal authority with every other, but no greater, and to be construed and applied in harmony with all the provisions of that instrument. That immunity, however, does not exempt the State from the operation of the Constitutional provision that no State shall pass any law impairing the obligation of contracts; for, it has long been settled, that contracts between a State and an individual are as fully protected by the Constitution as contracts between two individuals. It is true, that no remedy for a breach of its contract by a State, by way of damages as compensation, or by means of process to compel its performance, is open, under the Constitution, in the courts of the United States, by a direct suit against the State itself, on the part of the injured party, being a citizen of another State, or a citizen or subject of a foreign State. But it is equally true that whenever, in a controversy between parties to a suit, of which these courts have jurisdiction, the question arises upon the validity of a law by a State impairing the obligation of its contract, the jurisdiction is not thereby ousted, but must be exercised, with whatever legal consequences, to the rights of the litigants, may be the result of the determination. The cases establishing these propositions, which have been decided by this court since the adoption of the Eleventh Amendment to the Constitution, are numerous. *Fletcher* v. *Peck*, 6 Cranch, 87; *New Jersey* v. *Wilson*, 7 Cranch, 164; *Green* v. *Biddle*, 8 Wheat. 1, 84; *Providence Bank* v. *Billings*, 4 Pet. 514; *Woodruff* v. *Trapnall*, 10

How. 190; *Wolff* v. *New Orleans*, 103 U. S. 358; *Jefferson Branch Bank* v. *Skelly*, 1 Black, 436.

It is also true, that the question whether a suit is within the prohibition of the Eleventh Amendment is not always determined by reference to the nominal parties on the record. The provision is to be substantially applied in furtherance of its intention, and not to be evaded by technical and trivial subtleties. Accordingly, it was held in *New Hampshire* v. *Louisiana*, and *New York* v. *Louisiana*, 108 U. S. 76, that, although the judicial power of the United States extends to "controversies between two or more States," it did not embrace a suit in which, although nominally between two States, the plaintiff State had merely permitted the use of its name for the benefit of its citizens in the prosecution of their claims, for the enforcement of which they could not sue in their own names. So, on the other hand, in *Cunningham* v. *Macon and Brunswick Railroad Co.*, 109 U. S. 446, where the State of Georgia was not nominally a party on the record, it was held that, as it clearly appeared that the State was so interested in the property that final relief could not be granted without making it a party, the court was without jurisdiction.

In that case, the general question was discussed in the light of the authorities, and the cases in which the court had taken jurisdiction, when the objection had been interposed, that a State was a necessary party to enable the court to grant relief, were examined and classified. The second head of that classification is thus described : " Another class of cases is where an individual is sued in tort for some act injurious to another in regard to person or property, to which his defence is that he has acted under the orders of the government. In these cases he is not sued as, or because he is, the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he *asserts* authority as such officer. To make out his defence he must show that his authority was sufficient in law to protect him." And in illustration of this principle reference was made to *Mitchell* v. *Harmony*, 13 How. 115; *Bates* v. *Clark*, 95 U. S. 204; *Meigs* v. *McClung*, 9 Cranch, 11; *Wilcox* v. *Jackson*, 13 Pet. 498; *Brown* v. *Huger*, 21 How. 305;

*Grisar* v. *McDowell*, 6 Wall. 363; and *United States* v. *Lee*, 106 U. S. 196.

The *ratio decidendi* in this class of cases is very plain. A defendant sued as a wrong-doer, who seeks to substitute the State in his place, or to justify by the authority of the State, or to defend on the ground that the State has adopted his act and exonerated him, cannot rest on the bare assertion of his defence. He is bound to establish it. The State is a political corporate body, can act only through agents, and can command only by laws. It is necessary, therefore, for such a defendant, in order to complete his defence, to produce a law of the State which constitutes his commission as its agent, and a warrant for his act. This the defendant, in the present case, undertook to do. He relied on the act of January 26, 1882, requiring him to collect taxes in gold, silver, United States treasury notes, national bank currency, and nothing else, and thus forbidding his receipt of coupons in lieu of money. That, it is true, is a legislative act of the government of Virginia, but it is not a law of the State of Virginia. The State has passed no such law, for it cannot; and what it cannot do, it certainly, in contemplation of law, has not done. The Constitution of the United States, and its own contract, both irrepealable by any act on its part, are the law of Virginia; and that law made it the duty of the defendant to receive the coupons tendered in payment of taxes, and declared every step to enforce the tax, thereafter taken, to be without warrant of law, and therefore a wrong. He stands, then, stripped of his official character; and, confessing a personal violation of the plaintiff's rights for which he must personally answer, he is without defence.

No better illustration of this principle can be found than that which is furnished by the case of *United States* v. *Lee*, 106 U. S. 196, in which it was applied to a claim made on behalf of the National Government. The action was one in ejectment, to recover possession of lands, to which the plaintiff claimed title. The defendants were natural persons, whose defence was that they were in possession as officers of the United States under the orders of the government and for its

uses. The Attorney-General called this aspect of the case to the attention of the court, but without making the United States a party defendant. It was decided by this court that to sustain the defence, and to defeat the plaintiff's cause of action, it was necessary to show that the defendants were in possession under the United States, and on their behalf, by virtue of some valid authority. As this could not be shown, the contrary clearly appearing, possession of lands, actually in use as a national cemetery, was adjudged to the plaintiffs. The decision in that case was rested largely upon the authority of *Osborn* v. *Bank of the United States*, 9 Wheat. 738, which was a suit in equity against an officer of the State of Ohio, who sought to enforce one of her statutes which was in violation of rights secured to the bank by the Constitution of the United States. The defendants, Osborn and others, denied the jurisdiction of the court, upon the ground that the State was the real party in interest and could not be sued, and that a suit against her officers, who were executing her will, was in violation of the Eleventh Amendment of the Constitution. To this objection, Chief Justice Marshall replied: " If the State of Ohio could have been made a party defendant, it can scarcely be denied that this would be a strong case for an injunction. The objection is that, as the real party cannot be brought before the court, a suit cannot be sustained against the agents of that party; and cases have been cited to show that a Court of Chancery will not make a decree unless all those who are substantially interested be made parties to the suit. This is certainly true where it is in the power of the plaintiff to make them parties; but if the person who is the real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong which they would afford against him could his principal be joined in the suit." This language, it may be observed, was quoted with approval in *United States* v. *Lee*. The principle which it enunciates con-

stitutes the very foundation upon which the decision in that case rested.

In the discussion of such questions, the distinction between the government of a State and the State itself is important, and should be observed. In common speech and common apprehension they are usually regarded as identical; and as ordinarily the acts of the government are the acts of the State, because within the limits of its delegation of power, the government of the State is generally confounded with the State itself, and often the former is meant when the latter is mentioned. The State itself is an ideal person, intangible, invisible, immutable. The government is an agent, and, within the sphere of the agency, a perfect representative; but outside of that, it is a lawless usurpation. The Constitution of the State is the limit of the authority of its government, and both government and State are subject to the supremacy of the Constitution of the United States, and of the laws made in pursuance thereof. So that, while it is true in respect to the government of a State, as was said in *Langford* v. *United States*, 101 U. S. 341, that the maxim, that the king can do no wrong, has no place in our system of government; yet, it is also true, in respect to the State itself, that whatever wrong is attempted in its name is imputable to its government, and not to the State, for, as it can speak and act only by law, whatever it does say and do must be lawful. That which, therefore, is unlawful because made so by the supreme law, the Constitution of the United States, is not the word or deed of the State, but is the mere wrong and trespass of those individual persons who falsely speak and act in its name. It was upon the ground of this important distinction that this court proceeded in the case of *Texas* v. *White*, 7 Wall. 700, when it adjudged that the acts of secession, which constituted the civil war of 1861, were the unlawful acts of usurping State governments, and not the acts of the States themselves, inasmuch as " the Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States;" and that, consequently, the war itself was not a war between the States, nor a war of the United States against States, but a war of the United States against

unlawful and usurping governments, representing not the States, but a rebellion against the United States. This is, in substance, what was said by Chief Justice Chase, delivering the opinion of the court in *Thorington* v. *Smith*, 8 Wall. 1, 9, when he declared, speaking of the Confederate government, that "it was regarded as simply the military representative of the insurrection against the authority of the United States." The same distinction was declared and enforced in *Williams* v. *Bruffy*, 96 U. S. 176, 192, and in *Horn* v. *Lockhart*, 17 Wall. 570, both of which were referred to and approved in *Keith* v. *Clark*, 97 U. S. 454, 465.

This distinction is essential to the idea of constitutional government. To deny it or blot it out obliterates the line of demarcation that separates constitutional government from absolutism, free self-government based on the sovereignty of the people from that despotism, whether of the one or the many, which enables the agent of the State to declare and decree that he is the State; to say "*L'État c'est moi.*" Of what avail are written constitutions whose bills of right for the security of individual liberty have been written, too often, with the blood of martyrs shed upon the battle-field and the scaffold, if their limitations and restraints upon power may be overpassed with impunity by the very agencies created and appointed to guard, defend, and enforce them; and that, too, with the sacred authority of law, not only compelling obedience, but entitled to respect? And how else can these principles of individual liberty and right be maintained, if, when violated, the judicial tribunals are forbidden to visit penalties upon individual offenders, who are the instruments of wrong, whenever they interpose the shield of the State? The doctrine is not to be tolerated. The whole frame and scheme of the political institutions of this country, State and Federal, protest against it. Their continued existence is not compatible with it. It is the doctrine of absolutism, pure, simple, and naked; and of communism, which is its twin; the double progeny of the same evil birth.

It was said by Chief Justice Chase, speaking for the whole court in *Lane County* v. *Oregon*, 7 Wall. 71, 76, that the peo-

ple, through the Constitution of the United States, " established a more perfect union by substituting a national government, acting, with ample power, directly upon the citizens, instead of the confederate government, which acted with powers, greatly restricted, only upon the States." In no other way can the supremacy of that Constitution be maintained. It creates a government in fact, as well as in name, because its Constitution is the supreme law of the land, "anything in the Constitution or laws of any State to the contrary notwithstanding ;" and its authority is enforced by its power to regulate and govern the conduct of individuals, even where its prohibitions are laid only upon the States themselves. The mandate of the State affords no justification for the invasion of rights secured by the Constitution of the United States ; otherwise, that Constitution would not be the supreme law of the land. When, therefore, an individual defendant pleads a statute of a State, which is in violation of the Constitution of the United States, as his authority for taking or holding property, to which the citizen asserts title, and for the protection or possession of which he appeals to the courts, to say that the judicial enforcement of the supreme law of the land, as between the individual parties, is to coerce the State, ignores the fundamental principles on which the Constitution rests, as contrasted with the Articles of Confederation, which it displaced ; and, practically, makes the statutes of the States the supreme law of the land within their respective limits.

When, therefore, by the act of March 30, 1871, the contract was made, by which it was agreed that the coupons issued under that act should thereafter be receivable in payment of taxes, it was the contract of the State of Virginia, because, though made by the agency of the government, for the time being, of the State, that government was acting within the scope of its authority, and spoke with its voice as its true representative ; and inasmuch as, by the Constitution of the United States, which is also the supreme law of Virginia, that contract, when made, became thereby unchangeable and irrepealable by the State, the subsequent act of January 26, 1882, and all other like acts, which deny the obligation of that con-

tract and forbid its performance, are not the acts of the State of Virginia. The true and real Commonwealth which contracted the obligation is incapable in law of doing anything in derogation of it. Whatever having that effect, if operative, has been attempted or done, is the work of its government acting without authority, in violation of its fundamental law, and must be looked upon, in all courts of justice, as if it were not and never had been. The argument, therefore, which seeks to defeat the present action, for the reason that it is a suit against the State of Virginia, because the nominal defendant is merely its officer and agent, acting in its behalf, in its name, and for its interest, and amenable only to it, falls to the ground, because its chief postulate fails. The State of Virginia has done none of these. things with which this defence charges her. The defendant in error is not her officer, her agent, or her representative, in the matter complained of, for he has acted not only without her authority, but contrary to her express commands. The plaintiff in error, in fact and in law, is representing her, as he seeks to establish her law, and vindicates her integrity as he maintains his own right.

Tried by every test which has been judicially suggested for the determination of the question, this cannot be considered to be a suit against the State. The State is not named as a party in the record; the action is not directly upon the contract; it is not for the purpose of controlling the discretion of executive officers, or administering funds actually in the public treasury, as was held to be the case in *Louisiana* v. *Jumel*, 107 U. S. 711; it is not an attempt to compel officers of the State to do the acts which constitute a performance of its contract by the State, as suggested by a minority of the court in *Antoni* v. *Greenhow*, 107 U. S. 769, 783; nor is it a case where the State is a necessary party, that the defendant may be protected from liability to it, after having answered to the present plaintiff. For, on this supposition, if the accounting officers of the State government refuse to credit the tax collector with coupons received by him in payment of taxes, or seek to hold him responsible for a failure to execute the void statute, which required him to refuse coupons in payment of taxes, in any action or

prosecution brought against him in the name of the State, the grounds of the judgment rendered in favor of the present plaintiff will constitute his perfect defence. And as that defence, made in any cause, though brought in a State court, would present a question arising under the Constitution and laws of the United States, it would be within the jurisdiction of this court to give it effect, upon a writ of error, without regard to the amount or value in dispute.

In the case of *Osborn* v. *The Bank of the United States*, 9 Wheat. 738, 853, Chief Justice Marshall put, by way of argument and illustration, the very case we are now considering. He said : " Controversies respecting boundary have lately existed between Virginia and Tennessee, between Kentucky and Tennessee, and now exist between New York and New Jersey. Suppose, while such a controversy is pending, the collecting officer of one State should seize property for taxes belonging to a man who supposes himself to reside in the other State, and who seeks redress in the Federal court of that State in which the officer resides. The interest of the State is obvious. Yet it is admitted, that in such a case the action would lie, because the officer might be treated as a trespasser, and the verdict and judgment against him would not act directly on the property of the State. That it would not so act, may, perhaps, depend on circumstances. The officer may retain the amount of the taxes in his hands, and, on the proceedings of the State against him, may plead in bar the judgment of a court of competent jurisdiction. If this plea ought to be sustained, and it is far from being certain that it ought not, the judgment so pleaded would have acted directly on the revenue of the State in the hands of its officers. And yet the argument admits that the action, in such a case, would be sustained. But suppose, in such a case, the party conceiving himself to be injured, instead of bringing an action sounding in damages, should sue for the specific thing, while yet in the possession of the seizing officer. It being admitted, in argument, that the action sounding in damages would lie, we are unable to perceive the line of distinction between that and the action of detinue. Yet the latter action would claim the specific article seized for the tax,

and would obtain it, should the seizure be deemed unlawful."

Although the plaintiff below was nominally the actor, the action itself is purely defensive. Its object is merely to resist an attempted wrong and to restore the *status in quo* as it was when the right to be vindicated was invaded. In this respect, it is upon the same footing with the preventive remedy of injunction in equity, when that jurisdiction is invoked, and of which a conspicuous example, constantly followed in the courts of the United States, was the case of *Osborn* v. *The Bank of the United States, ubi supra.* In that case, the taxing power of the State was resisted on the ground that its exercise threatened to deprive the complainant of a right conferred by the Constitution of the United States. The jurisdiction has been constantly exerted by the courts of the United States to prevent the illegal taxation of national banks by the officers of the States; and in *Cummings* v. *National Bank,* 101 U. S. 153, 157, it was laid down as a general principle of equity jurisdiction, " that when a rule or system of valuation is adopted by those whose duty it is to make the assessment, which is designed to operate unequally and to violate a fundamental principle of the Constitution, and when this rule is applied not solely to one individual, but to a large class of individuals or corporations, equity may properly interfere to restrain the operation of this unconstitutional exercise of power."

And it is no objection to the remedy in such cases, that the statute whose application in the particular case is sought to be restrained is not void on its face, but is complained of only because its operation in the particular instance works a violation of a constitutional right ; for the cases are numerous, where the tax laws of a State, which in their general and proper application are perfectly valid, have been held to become void in particular cases, either as unconstitutional regulations of commerce, or as violations of contracts prohibited by the Constitution, or because in some other way they operate to deprive the party complaining of a right secured to him by the Constitution of the United States. At the present term of this court, at least three cases have been decided, in which railroad companies

have been complainants in equity, seeking to restrain officers of States from collecting taxes, on the ground of an exemption by contract, and no question of jurisdiction has been raised. The practice has become common, and is well settled on incontestable principles of equity procedure. *Memphis Railroad* v. *Railroad Commissioners*, 112 U. S. 609; *St. Louis, &c., Ry. Co.* v. *Berry*, 113 U. S. 465; *Chesapeake & Ohio Railroad Co.* v. *Miller, ante*, 176.

It is still urged upon us, however, in argument, that notwithstanding all that has been or can be said, it still remains that the controversy disclosed by the record is between an individual and the State; that the State alone has any real interest in its determination; that the practical effect of such determination is to control the action of the State in the regular and orderly administration of its public affairs; and that, therefore, the suit is and must be regarded as a suit against the State, within the prohibition of the Eleventh Amendment to the Constitution. Omitting for the time being the consideration already enforced, of the fallacy that lies at the bottom of this objection, arising from the distinction to be kept in view between the government of a State and the State itself, the premises which it assumes may all be admitted, but the conclusion would not follow. The same argument was employed in the name of the United States in the Lee Case, and did not prevail. It was pressed with the greatest force of which it was susceptible in the case of *Osborn* v. *The Bank of the United States*, and was met and overcome by the masterly reasoning of Chief Justice Marshall. It appeared early in the history of this court, in 1799, in the case of *Fowler* v. *Lindsey*, 3 Dall. 411, in which that able magistrate, Mr. Justice Washington, pronounced his first reported opinion. On a motion to remove the cause by *certiorari* from the Circuit Court, on the ground that it was a suit in which a State was a party, it being an ejectment for lands, the title to which was claimed under grants from different States, he said: "A case which belongs to the jurisdiction of the Supreme Court, on account of the interest that a State has in the controversy, must be a case in which a State is either nominally or substantially the party.

It is not sufficient that a State may be consequentially affected; for in such case (as where the grants of different States are brought into litigation), the Circuit Court has clearly a jurisdiction. And this remark furnishes an answer to the suggestions that have been founded on the remote interest of the State, in making retribution to her grantees, upon the event of an eviction."

The thing prohibited by the Eleventh Amendment is the exercise of jurisdiction in a " suit in law or equity commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." Nothing else is touched; and suits between individuals, unless the State is the party, in a substantial sense, are left untouched, no matter how much their determination may incidentally and consequentially affect the interests of a State, or the operations of its government. The fancied inconvenience of an interference with the collection of its taxes by the government of Virginia, by suits against its tax collectors, vanishes at once upon the suggestion that such interference is not possible, except when that government seeks to enforce the collection of its taxes contrary to the law and contract of the State, and in violation of the Constitution of the United States. The immunity from suit by the State now invoked, vainly, to protect the individual wrong-doers, finds no warrant in the Eleventh Amendment to the Constitution, and, is, in fact, a protest against the enforcement of that other provision which forbids any State from passing laws impairing the obligation of contracts. To accomplish that result requires a new amendment, which would not forbid any State from passing laws impairing the obligation of its own contracts.

What we are asked to do is, in effect, to overrule the doctrine in *Fletcher* v. *Peck*, 6 Cranch, 87, and hold that a State is not under a constitutional obligation to perform its contracts, for it is equivalent to that to say that it is not subject to the consequences when that constitutional prohibition is applied to suits between individuals. We could not stop there. We should be required to go still further, and reverse the doctrine on which that constitutional provision rests, stated by Chief Justice Mar-

shall in that case, when he said, pages 135–6: "When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot divest those rights; and the act of annulling them, if legitimate, is rendered so by a power applicable to the case of every individual in the community. It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power; and, if any be prescribed, where are they to be found if the property of an individual, fairly and honestly acquired, may be seized without compensation? To the legislature all legislative power is granted; but the question, whether the act of transferring the property of an individual to the public be in the nature of legislative power, is well worthy of serious reflection." And, in view of such a contention, we may well add the impressive and weighty words of the same illustrious man, when he said, in *Marbury* v. *Madison*, 1 Cranch, 137, 163: "The Government of the United States has been emphatically termed a government of laws and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right."

It is contended, however, in behalf of the defendant in error, that the act of January 26, 1882, under which he justified his refusal of the tender of coupons, does not impair the obligation of the contract between the coupon-holder and the State of Virginia, inasmuch as it secures to him a remedy equal in legal value to all that it takes away, and that consequently, as the State may lawfully legislate by changing remedies so that it does not destroy rights, the remedy thus provided is exclusive, and must defeat the plaintiff's action.

The remedy thus substituted and declared exclusive is one that requires the tax-payer demanding to have coupons received in payment of taxes, first, to pay the taxes due from him in money, under protest, when, within thirty days thereafter, he may sue the officer to recover back the amount paid, which, on obtaining judgment therefor, shall be refunded by the auditor of public accounts out of the treasury. By the amendment passed March 13, 1884, the coupons tendered are required to

be sealed up and marked for identification, filed with the petition at the commencement of the suit, produced on the trial as evidence of the tender, and delivered to the auditor of public accounts to be cancelled when he issues his warrant for the amount of the judgment.

It is contended that in view of this remedy, the case is ruled by the decision of this court in *Antoni* v. *Greenhow*, 107 U. S. 769. We have, however, already shown, by extracts from the opinion of the court in that case, that the question involved in the present proceeding was not covered by that judgment. In that case the plaintiff in error was seeking to compel the officer specifically to receive his coupons in payment of taxes by *mandamus*, on the ground that he was entitled to that remedy when the contract was made by the law of March 30, 1871. The law giving that remedy was subsequently amended, requiring the petitioner to pay the taxes in money in the first instance, and permitting the writ to issue only after a trial, in which the genuineness of the coupons tendered had been established. The court held that he might have been put to the same proof in the former mode of proceeding, and that the amendment did not destroy the efficiency of the remedy.

But here the plaintiff did not seek any compulsory process against the officer to require him specifically to receive the coupons tendered. He offered them and they were refused. He chose to stand upon the defensive and maintain his rights as they might be assailed. His right was to have his coupon received for taxes when offered. That was the contract. To refuse to receive them was an open breach of its obligation. It is no remedy for this that he may acquiesce in the wrong, pay his taxes in money which he was entitled to pay in coupons, and bring suit to recover it back. His tender, as we have already seen, was equivalent to payment so far as concerns the legality of all subsequent steps by the collector to enforce payment by distraint of his property. He has the right to say he will not pay the amount a second time, even for the privilege of recovering it back. And if he chooses to stand upon a lawful payment once made, he asks no remedy to recover back taxes illegally collected, but may resist the exaction, and treat

as a wrong-doer the officer who seizes his property to enforce it.

It is suggested that the right to have coupons received in payment of taxes is a mere right of set-off, and is itself but a remedy, subject to the control of legislation. Ordinarily, it is true, the right to set off mutual independent debts, by way of compensation and satisfaction, is dependent on the general law, does not enter into the contract, although it may be the *lex loci contractus*, and is dependent for its enforcement upon the *lex fori*, when suit is brought, and consequently may be changed by the legislature without impairing vested rights. But in such cases the right is entirely dependent upon the general law, and changes with it. It is different, when, as in many cases of equitable set-off, it inheres in the transaction, or arises out of the relations of the parties; and it may in any case, as it was in this, be made the subject of contract between parties. When this is done, it stands upon the footing of every other lawful contract, upon valuable consideration, the obligation of which cannot be impaired by subsequent legislation.

It is urged upon us, however, that in a revenue system, a provision of law which gives to a party complaining of an illegal exaction of taxes, the right to recover back the amount in dispute only after previous payment under protest, as the sole remedy, against either the officer or the government, is a just and reasonable rule, sufficiently securing private rights, and convenient, if not necessary, to the interests of the public. We are referred to the revenue laws of the United States for illustration and example, and the question is put, why a similar provision, as it is assumed to be, should not be considered adequate as a remedy for the holders of coupons in Virginia, who have been denied the right to use them in payment of taxes.

The answer is obvious and complete. Virginia, by a contract which the Constitution of the United States disables her from impairing, has bound herself that it shall be otherwise. The State has agreed that the coupons cut from her bonds shall be received in payment of taxes due to her, as though they were money. When the tax-payer has tendered such coupons, he has complied with the agreement, and in legal contemplation

has paid the debt he owed the State. So far as that tax is con-, cerned, and every step taken for enforcing its payment in disregard of that tender, the coupon-holder is withdrawn from the power and jurisdiction of the State. He is free from all further disturbance, and is securely shielded by the Constitution in his immunity. No proceeding, whatever its pretext, which does not respect this right, can be judicially upheld. The question is not of the reasonableness of a remedy for a breach of the contract to receive the tendered coupons in payment of the tax; it is whether the right to have them so received, and the use of that right as a defence against all further efforts to exact and compel payment of the tax, in denial and defiance of that right, can be taken away without a violation of that provision of the Constitution which prohibits the States from passing laws which impair the obligation of contracts. Certainly, a law which takes from the party his whole contract, and all the rights which it was intended to confer, must be regarded as a law impairing its obligation.

Another point remains for consideration. Rev. Stat. § 721, provides that "the laws of the several States, except where the Constitution, treaties or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply;" and § 914 declares that "the practice, pleadings and forms and modes of proceeding in civil causes, other than equity and admiralty causes, in the Circuit and District Courts, shall conform, as near as may be, to the practice, pleadings and forms and modes of proceeding existing at the time in like causes in the courts of record of the State within which such Circuit or District Courts are held, any rule of court to the contrary notwithstanding." Upon these sections it is argued that, admitting the acts of the General Assembly of Virginia of January 26, 1882, and the amendment by the act of March 13, 1884, to be unconstitutional and void, so far as they forbid tax collectors from receiving coupons in payment of taxes, nevertheless, as the State has control over the forms of action and modes of proceeding by way of remedy, and has forbidden, in cases where the tax collector has refused

coupons in payment of taxes, any personal action against him other than the suit to recover back the tax demanded and paid under protest, the same law, by force of the Revised Statutes of the United States, must govern in the courts of the United States.

It is not entirely clear, on the face of the act of January 26, 1882, that it does forbid actions against the officer for illegally levying upon the property of the coupon-holder for the tax which he has offered to pay. The language of the act seems to embrace only such suits as are framed with the direct object of preventing or restraining him from taking steps to collect the tax. And this uncertainty is not made clear by the amendatory act of March 13, 1884, which, by expressly forbidding actions of trespass or trespass on the case to be brought or maintained against any collecting officer for levying upon the property of any tax-payer who may have tendered coupons in payment of the tax demanded, would seem to have left the action of detinue, which was authorized in such cases by the previously existing law of Virginia, untouched by the prohibition.

We shall assume, however, for the purposes of this opinion, that these acts of the General Assembly of Virginia were intended to and do forbid every action, of whatever kind, against the collecting officer, for the recovery of specific property taken by distraint, or of damages for its caption or detention, and leaves to the coupon-holder, as his sole right of action, the suit to recover back the money illegally collected from him.

This action, as we have already seen, is no remedy whatever for the loss of the specific right of paying his taxes with coupons. It does not even profess so to be. Neither is it a remedy for the loss of the right sought to be vindicated in this and other personal actions against the collector for unlawfully taking from the plaintiff his property. And, upon the supposition made, this wrong is without remedy by any law of Virginia.

The direct result, then, of giving effect to these provisions of the act in question is to defeat entirely the right of the

coupon-holder to pay his taxes with his coupons, which we have already said avoids that part of the acts in question which forbids it in terms, and to take from him that right as a defence against the wrongs and trespasses committed upon him and his property in denial and defiance of it. All persons, whose property is unlawfully taken, otherwise than to enforce payment of taxes, are secured in their right of action for redress. But the coupon-holder, to whom the Constitution of the United States guarantees the right, conferred upon him by the law and contract of Virginia, to pay his taxes in coupons, is excepted. The discrimination is made against him in order to deprive him of that right, and, if permitted, will have the effect of denying to him all redress for a deprivation of a right secured to him by the Constitution. To take away all remedy for the enforcement of a right is to take away the right itself. But that is not within the power of the State.

Rev. Stat. § 721, it will be observed, makes an express exception, in reference to the adoption of State laws as rules of decision, of cases where the Constitution otherwise requires, which it does wherever the adoption of the State law deprives a complaining party of a remedy essential to the vindication of a right, and that right is derived from or protected by the Constitution of the United States. The same exception is implied in § 914, the language of which, indeed, is not imperative, as the conformity required in the practice and procedure of the courts of the United States with that of the State courts needs only to be "as near as may be." No one would contend that a law of a State, forbidding all redress by actions at law for injuries to property, would be upheld in the courts of the United States, for that would be to deprive one of his property without due process of law. This is exactly what the statutes in question undertake to do, in respect to that class of persons whose property is taken from them for the offence of asserting, under the protection of the Constitution, the right to pay their taxes in coupons. The contract with Virginia was not only that the coupons should be received in payment of taxes, but, by necessary implication, that the tax-payer making such a tender should not be molested further, as though he were a

delinquent, and that for every illegal attempt subsequently to enforce the collection of the tax, by the seizure of property, he should have the remedies of the law in force when the contract was made, for redress, or others equally effective. " The obligation of a contract," said this court, in *McCracken* v. *Hayward*, 2 How. 608, 612, " consists in its binding force on the party who makes it. This depends on the laws in existence when it is made ; these are necessarily referred to in all contracts, and forming a part of them, as the measure of the obligation to perform them by the one party and the right acquired by the other. There can be no other standard by which to ascertain the extent of either, than that which the terms of the contract indicate, according to their settled legal meaning ; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other a right to enforce the performance by the remedies then in force. If any subsequent law affect to diminish the duty or to impair the right, it necessarily bears on the obligation of the contract, in favor of one party to the injury of the other; hence, any law which in its operation amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the Constitution."

The acts of assembly in question must be taken together, as one is but an amendment to the other. The scheme of the whole is indivisible. It cannot be separated into parts. It must stand or fall together. The substantive part of it, which forbids the tax collector to receive coupons in payment of taxes, as we have already declared, as, indeed, on all sides is admitted, cannot stand, because it is not consistent with the Constitution. That which is merely auxiliary to the main design must also fall with the principal of which it is merely an incident ; and it follows that the acts in question are not laws of Virginia, and are therefore not within the sections of the Revised Statutes referred to, nor obligatory upon the courts of the United States.

It is undoubtedly true that there may be cases where one part of a statute may be enforced as constitutional, and another

be declared inoperative and void, because unconstitutional; but these are cases where the parts are so distinctly separable that each can stand alone, and where the court is able to see, and to declare, that the intention of the legislature was that the part pronounced valid should be enforceable, even though the other part should fail. To hold otherwise would be to substitute for the law intended by the legislature one they may never have been willing by itself to enact. An illustration of this principle is found in the *Trade Mark Cases*, 100 U. S. 82, where an act of Congress, which, it was claimed, would have been valid as a regulation of commerce with foreign nations and among the States, was held to be void altogether, because it embraced all commerce, including that between the citizens of the same State, which was not within the jurisdiction of Congress, and its language could not be restrained to that which was subject to the control of Congress. " If we should," said the court in that case, p. 99, "in the case before us undertake to make, by judicial construction, a law which Congress did not make, it is quite probable we should do what, if the matter were now before that body, it would be unwilling to do."

Indeed it is quite manifest, from the face of the laws themselves, that they are together but parts of a larger whole. By an act of the General Assembly of Virginia, passed February 14, 1882, the Legislature re-stated the account between the State and its creditors on a basis of readjustment which reduced it to the sum of $21,035,377.15, including interest in arrears to July 1, 1882, which was thereby declared to be her equitable share of the debt of the old and entire State, and on which it was also declared that the State was not able to pay interest for the future at a larger rate than three per cent. per annum. The outstanding debt, of which this was a reduction, was then classified, and bonds of the State were authorized to be issued, bearing interest at the rate of three per cent. per annum, in exchange for outstanding bonds of the different classes, scaled at rates of fifty-three per cent., sixty per cent., sixty-nine per cent., sixty-three per cent., and, as to one class, as high as eighty per cent., which were to be retired

and cancelled.  The coupons on the new bonds were not made receivable in payment of taxes.  To coerce creditors holding bonds issued under the act of March 30, 1871, to exchange them for these new bonds, at these reduced rates, and with them to give up their security for the payment of interest, arising out of the receivability of coupons in payment of taxes, is the evident purpose of the acts of January 26, 1882, and of March 13, 1884, and all together form a single scheme, the undisguised object of which is to enable the State to rid itself of a considerable portion of its public debt, and to place the remainder on terms to suit its own convenience, without regard to the obligation it owes to its creditors.

The whole legislation, in all its parts, as to creditors affected by it and not consenting to it, must be pronounced null and void.  Such is the sentence of the Constitution itself, the fundamental and supreme law for Virginia, as for all the States and for all the people, both of the States separately and of the United States, and which speaks with sovereign and commanding voice, expecting and receiving ready and cheerful obedience, not so much for the display of its power, as on account of the majesty of its authority and the justice of its mandates.

*The judgment of the Hustings Court of the City of Richmond is accordingly reversed, and the cause will be remanded, with directions to render judgment upon the agreed statement of facts in favor of the plaintiff.*

MR. JUSTICE BRADLEY, with whom concurred the CHIEF JUSTICE, MR. JUSTICE MILLER, and MR. JUSTICE GRAY dissented. Their dissenting opinion will be found *post*, page 330, after the opinion of the court in MARYE *v.* PARSONS.