## BRAGG v. TUFFTS.

1. LEGISLATION: *Power to raise revenue: Convention of 1861.*

The legislative power of this State having been confided to a General Assembly consisting of a Senate and House of Representatives, subject to the veto of the Governor, the convention of 1861, called "to take into consideration the condition of political affairs," and being a body consisting of a single chamber, could not exercise legislative functions, such as providing means to meet the expenses of government; and therefore had no power to pass the ordinance of May 28, 1861, styled "An Ordinance to provide revenue for the State of Arkansas," and could not bind the State by treasury warrants issued thereunder.

2. TREASURY WARRANTS: *Issued under void ordinance.*

An ordinance of the convention of 1861, styled "An Ordinance to provide revenue for the State of Arkansas," adopted May 28, 1861, provided for the issuance by the State Treasurer of bonds to the amount of $2,000,000, to be used in aid of the civil war, and set apart the ordinary revenues of the State for the payment of the interest on the same; and also provided in effect, that when there was no money in the treasury, all audited claims against the State, whether for legitimate expenses of government, or for military services and munitions of war, should be paid in warrants to be issued by the Treasurer. *Held:* That the provisions of the ordinance are so mutually connected with and dependent upon each other, as to constitute one scheme; and the ordinance being essentially a war measure and therefore void, the warrants issued by its authority are also void.

Bragg v. Tuffts.

3. SAME: *When void as being bills of credit.*

Certain treasury warrants issued between November 18, 1861, and December 1, 1862, are in the following form:

"Arkansas Treasury Warrant, No. 1126, on Auditor's Warrant No. 2182.

"The State of Arkansas promises to pay F. Bates or bearer ten dollars, with interest at eight per centum per annum, to be paid in the order of their number. November 18, 1861.

"$10                                                    O. BASHAM, Treasurer."

*Held:* That such warrants are void, as being "bills of credit," within the meaning of the Constitution of the United States (*art. 1, sec. 10*), as they were issued on the faith and credit of the State, are direct promises of the State to pay money and (as appears from the acts of November 18, 1861) were designed to be a substitute for money.

APPEAL from *Ouachita* Circuit Court.

B. F. ASKEW, Judge.

*Barker & Johnson* for appellant.

All that class of treasury warrants issued to maintain the families of Confederate soldiers, the purchase of war materials, printing war bonds, payment of the military board, etc., were *absolutely void. 14th Am. Const. U. S.; 30 Ark., 198; 24 id., 286; 17 Wall., 580.*

Collectors were forbidden to receive any treasury warrants issued prior to the 23d July, 1868. *Rev. Act 1883, p. 256.* This act is constitutional. See *7 Wall., 700; 15 id., 429; art. 2, sec. 23, Const. 1874; id., secs. 5 and 11, art. 16; 3 Dallas, 386; 6 Cranch, 87; 2 Story Const., p. 236, sec. 1385; Smith Const. Law, p. 384, sec. 252.*

No State can make anything but gold and silver a tender in payment of debts. *Const. U. S., art. 1, sec. 10.* See, also, dissenting opinion in *10 Howard, 203.*

*Dan W. Jones*, Attorney General, for appellant.

These warrants could not have been issued under act of the

Legislature prior to 1861, and hence it must be admitted they were all issued under the ordinance of the convention, May 28, 1861. See *Acts 1844–5, pp. 88–97; Acts 1846, p. 79; Ordinances of the Convention, 1861, pp. 55, 60, 79, 80.*

1. Said ordinances were illegal, contrary to the Constitution of the United States and void, and said warrants are not legal obligations of the State. First, because said ordinances were in aid of the attempt to dissolve the connection of the State of Arkansas with the Federal government. The legal parts of said ordinance cannot be separated from the illegal, and the whole must go. *24 Ark., 286; Cooley Cons. Lim., 177.*

The object was not only to raise money to pay the legitimate expenses of the State, but to pay for arms and munitions of war, soldiers and other *"military"* purposes. The ordinance is inseparable and cannot stand. Its sole object was to put the State on a war footing.

2. These warrants are bills of credit within the meaning of *sec. 10, art. 1, Const. U. S.*

They were issued as money and intended to circulate as such. See *Acts 1861, pp. 43–6; and 78–9; 4 Peters, 410, 432, 453–4.*

*H. G. Bunn* for appellee.

1. The warrants having been issued to pay the ordinary expenditures of the State, were not in aid of rebellion, and are valid. *24 Ark., 286; 30 Ark., 198; 29 Ark., 414; id., 761; 7 Wall., 700; 22 id., 479; 16 id., 413.*

As to the second proposition. The majority of the court in the case of *Craig et al. v. The State of Missouri, 4 Peters, 410,* through Chief Justice MARSHALL, says:

"The word 'emit' is never employed in describing those contracts by which a State binds itself to pay money at a fu-

ture day for service actually rendered, or for money borrowed for present use; nor are instruments executed for such purposes, in common language, denominated 'bills of credit.' All script is issued to persons who have done services for the State, at least such has been the consideration of all script we have any knowledge of."

This doctrine was reaffirmed in *Byrne v. State of Missouri*, *8 Peters, 40.* It is also the doctrine held by this court in *English v. Oliver, 28 Ark., 317; Ramsey v. Cox, id., 366*, in passing upon warrants of similar form and purpose as those in question.

*M. W. Benjamin* and *F. W. Compton,* also for appellee.

Make the same points and cite : *24 Ark., 286; 29 id., 414; 30 id., 198; id., 761; 37 Ark., 110; 17 Wall., 580; 96 U. S., 192; 7 Wall., 732; 22 id., 103; 20 id., 464; 97 U. S., 454.*

SMITH, J. Tuffts applied to the Circuit Court for a writ of *mandamus* to compel the collector of Ouachita county to receive certain treasury warrants, issued between November 18, 1861, and December 1, 1862, in payment of taxes due the State. His petition states that he is the owner and holder of the warrants, fifty-seven in number, and aggregating the sum of $502 of principal and $857.72 of interest; that the warrants were issued on claims against the State, coming under the head of ordinary expenses of the State government; that these warrants had been tendered to the collector in payment of the "general State tax" levied upon the petitioner's property in said county, but the same had been refused.

An exemplification of the entries in the register of warrants, in the office of the Auditor of State, showing the names of the persons to whom, and the purposes for which, each of said warrants was issued, accompanied the petition. From this exhibit it appeared that the warrants were of the denomina-

tions $1, $5 and $10; and that they were issued in payment of the mileage and *per diem* of members of the General Assembly, of the salaries of executive and judicial officers, of the bills for printing the warrants and Arkansas war bonds and journals of the Legislature, and of expenses incurred by the military board. The form of the warrant was as follows:

"Arkansas Treasury Warrant, No. 1126, on Auditor's Warrant, No. 2182.

"The State of Arkansas promises to pay F. Bates, or bearer, ten dollars, with interest at 8 per centum per annum, to be paid in the order of their number. November 18, 1861.

"$10.                                    O. BASHAM, Treasurer."

The collector interposed a demurrer to the petition, which was overruled. He then filed a response, setting up various defences, which it is unneccessary to particularize. His response was adjudged to be insuffient upon demurrer; and, as he declined to plead further, final judgment went, awarding the peremptory writ.

The act of January 10, 1845, provided that all the legal liabilities and expenses of the State government should be paid in current money of the United States, and if there was not sufficient money in the treasury to pay any legal demand, it should be the duty of the Treasurer, on application of the claimant, to issue a treasury warrant for the amount due, bearing no interest. It further declared that such warrants should be receivable in payment of revenue due the State. *Session Acts of 1844–5, p. 88, secs. 4 and 11; Gould's Dig., ch. 23, sec. 30, and ch. 148, sec. 60.* A later act prohibited the issue of treasury warrants for sums less than five dollars *Act of December 21, 1846, in Session Acts of 1846, p. 79, sec. 6; Gould's Dig., ch. 23, sec. 31.* These acts had not been repealed at the date of the issue of the warrants involved in the present suit; although, in point of fact, the State had not for several years prior been compelled to resort to this expedient for defraying

its current expenses. But the warrants in suit could not have been issued under authority of these acts. For they bore interest at 8 per cent per annum, and some of them were in amount.less than five dollars. Authority for their issue must, therefore, be sought elsewhere; and it is to be found alone in the ordinance of May 28, 1861, adopted and passed by a State convention, called into being by an act of the Legislature, approved January 15, 1861, to "take into consideration the condition of political affairs and determine what course the State of Arkansas shall take in the present political crisis." *Session Acts of 1860–1, p. 214, sec. 8.*

The ordinance is styled "an ordinance to provide revenue for the State of Arkansas." The first section "consolidated and appropriated as a part of the revenue of the State, to be used for military· or other State purposes," "all moneys in the State treasury which have been received from the sale of seminary, saline, internal improvement and swamp lands, and all other public lands within the State, and all moneys now [then] in the hands of the various land officers, and in the various land offices throughout the State, arising from the sale of the lands above mentioned, and all moneys which may hereafter arise from the sale of the same."

It forbade "all further contracts for the reclamation of swamp lands by the State, to be paid out of the swamp-land fund or otherwise;" and it also forbade "all further distribution to the counties of the moneys arising from the sales of seminary, saline, and internal improvement lands."

The third section directed the immediate issue by the Treasurer of the State, of bonds, to be denominated Arkansas war bonds, to the amount of two millions of dollars, in specified denominations; and the fourth section appropriated out of the revenue of the State $160,000 annually, or so much thereof as might be necessary, to pay the interest on bonds actually sold.

The fifth section commanded the Treasurer to sell said bonds, and declared that "all funds arising from the sale of said bonds shall constitute a part of the revenue of the State for military and other State purposes."

The sixth section pledged "the faith of the State of Arkansas and all the public lands thereof" for the payment and redemption of said bonds.

By the seventh section it was declared that "when there are not sufficient par funds in the treasury to pay any warrant drawn by the Auditor (without disturbing the amount set apart to discharge the interest on the said war bonds), it shall be the duty of the Treasurer to issue to the holder of such warrant, a treasury warrant for the amount due, bearing interest at the rate of 8 per centum per annum, from the date of the same, and payable to the person entitled to such warrant, or to bearer."

By the eighth section, the manner of issuing such warrants is prescribed, and they are made receivable, at all times, from collectors and receivers of State revenue, without regard to number or date.

The tenth section declared said bonds, with their coupons, and said treasury warrants, with interest due thereon, receivable, at par, in payment of debts due the State and Real Estate Banks, and for any debt due the State, "either in her own right or as trustee," and in payment of State revenue.

See the ordinance in full at *p. 55, Ordinances of the Convention of 1861.*

1. LEGISLATION: Power to raise revenue: Convention of 1861.

The first question that suggests itself is, what right had the convention—a body consisting of but a single chamber—to enter upon the domain of general legislation? For the raising of revenue, the providing of ways and means to meet the expenses of administering the government, and the prescribing of the funds in which taxes are to be paid, are legislative func-

Bragg v. Tuffts.

tions, not of a fundamental character. But by the Constitution of 1836, and by all other Constitutions that have ever been in force in this State, the legislative power has been confided to a General Assembly, consisting of a Senate and House of Representatives. The Governor also has always had a voice in legislation—a limited power of vetoing measures which did not meet with his approval.

Now a convention called, for instance, to frame a new Constitution, has no inherent right to legislate about matters of detail. All of the powers that it possesses are such as have been delegated to it either by express grant or necessary implication. The passage of an ordinance, then, to raise revenue was an assumption of power by the convention, that was never ratified by the people of the State. For it is a noteworthy fact that the convention of 1861 never submitted any of its work to the test of a popular vote—neither its ordinance of secession, nor the Constitution which it promulgated on the 1st of June, 1861. *Jameson on Constitutional Conventions, 4th ed., sec. 419 et seq.; Wood's Appeal, 75 Penn. St., 59.*

The only justification for such extraordinary proceedings is to be found in the fact that the convention was, for the time, potentially the government of the State—that it had usurped all legislative and executive functions and its ordinances were the acts of a provisional government resting on a revolutionary basis.

But conceding that the convention might, under ordinary circumstances, have been competent to bind the State, how stands the case? Of the character and purposes of the bonds provided for by the ordinance, no doubt can remain, when it is remembered that this same convention had, on the 6th of May, 1861, by another ordinance, attempted to withdraw the State from the Union. They were appropriately named War Bonds and they were intended to be used in subverting the lawful

2. TREASURY WARRANTS: Issued under void ordinance.

36

authority of the United States and the supremacy of the Federal Constitution and laws.

But acts done and contracts made by one of the seceding States in the maintenance of its municipal and civil status, and not in aid of the war, nor having any tendency to impair the authority of the general government, are valid. *Hawkins v. Filkins, 24 Ark., 286; Hendry v. Cline, 29 id., 414; Berry v Bellows, 30 id., 198; State, use, etc., v. Brown, id., 761; Howell · v. Hogins, 37 id., 110; Texas v. White, 7 Wall. 700; Huntington v. Texas, 16 id., 402; Horn v. Lockhart, 17 id., 570; Taylor v. Thomas, 22 id., 479; U. S. v. Ins. Co., id., 99; Sprott v. U. S., 20 id., 464; Williams v. Bruffy, 96 U. S., 192; Keith v. Clark, 97 U. S., 454; Lusk v. Perkins, 48 Ark., 238.*

But can the treasury warrants be separated from the war bonds, so far as their receivability for future taxes is concerned? Are not both parts of one general scheme? And are they not so inextricably blended that there is no reason to suppose the convention would have directed the issue of one without the other? The scheme was to issue $2,000,000 of bonds; and in order to put them advantageously upon the market, the public lands were pledged for the payment of the principal, and for the payment of the interest the ordinary revenues of the State were set apart. When there was no money in the treasury, all audited claims against the State of whatsoever nature, whether they were for the legitimate expenses of government, or for military services and munitions of war, were to be paid in warrants. This circumstance alone would destroy the receivability of the warrants for taxes. *Prima facie* the entire issue is invalid. Neither the face of the paper, nor the ordinance, would disclose the consideration and nature of the claim upon which it was issued. Its legality or illegality would therefore depend upon the result of an examination of the accounts in the Auditor's office. But how could a tax col-

lector on his rounds, away from the seat of government, make such an examination?

The ordinance of May 28, 1861, was essentially a war measure. And its provisions are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the convention intended them as a whole, and, if all could not be carried into effect, the convention would not pass the residue independently. *Cooley Const. Lim. (177), et seq.*

But if we are mistaken in these positions, a further question would remain—whether these warrants are not bills of credit, within the meaning of section 10, article 1, of the Constitution of the United States. From the history of the American colonies and of the States, after they had declared their independence, down to the adoption of this Constitution; from the contemporary exposition in *The Federalist* and from all the judicial decisions, both Federal and State, that have been rendered, construing the clause, we know that the mischief which the framers intended to prevent was the issue of paper money by the States. To emit bills of credit was, therefore, for a State to issue its paper, payable on demand, or redeemable at a future day and intended to circulate as money. *2 Story on the Constitution, secs. 1358–70; The Federalist, No. 44; Craig v. Missouri, 4 Peters, 410; Briscoe v. Bank of Kentucky, 11 id., 257; Poindexter v. Greenhow, 114 U. S., 283–5.*

3. SAME: When void as being "bills of credit."

The promise to pay must be directly that of the State. Hence the bills of State banks are not bills of credit, although the State may own the entire stock and be the grantor of the circulation, because the bills are not issued directly by the State, nor in its name. *Briscoe v. Bank of Ky., supra; Woodruff v. Trapnall, 10 Howard, 205; Darrington v. State Bank, 13 id., 12; Curran v. Arkansas, 15 id., 318.*

The bills must be issued on the faith and credit of the State. It is immaterial whether or not a fund is assigned for their re-

demption.  For if the fund perishes, or is diverted, or withdrawn from the reach of the creditor, the State is still liable for the payment of the bills.  No exclusive credit is given to the fund, but the redemption of the paper is bottomed on the promise of the State.  *2 Story on the Constitution, sec. 1368.*

The bills must have been designed to be a substitute for money, to form a circulating medium between individuals and between government and individuals.  The legislative intent must be gathered from the terms of the act, which authorizes their issue.  It is not sufficient that individual holders have occasionally used the paper as currency in the ordinary transactions of business.  Mere acknowledgments of indebtedness by a State, either for borrowed money or services rendered, do not fall within the description of bills of credit, provided they are not intended to be put into circulation in the community as money.  Such are Auditor's warrants, which liquidate the amount that the State owes to an individual and which are to be presented to the Treasurer for payment and are not meant to circulate from hand to hand.  This is what we understand Chief Justice MARSHALL to mean, when he says, in *Craig v. Missouri, supra:*  "The word 'emit' is never employed in describing those contracts by which a State binds herself to pay money at a future day for services actually rendered, or for money borrowed for present use; nor are instruments executed for such purposes, in common language, denominated 'bills of credit.'"

Of course a State may borrow money and execute its obligations for repayment of the loan.  It may also issue its warrants or certificates of indebtedness in payment of its officers' salaries and other services rendered.  And the bonds and interest coupons in the one case, and the scrip in the other case may be by law made receivable in payment of taxes and other public dues.  But even in these cases, there must not be anything in the terms of the law which authorizes their issue, nor

in the circumstances of their creation, to show that the Legislature intended to put forth a paper currency for circulation in the community. For, from doing this, the States are expressly prohibited by the clause under consideration. *Craig v. Missouri, supra; Poindexter v. Greenhow, supra; Pagaud v. State, 5 Smede & Marshall, 491.*

Now these warrants were issued by the State and they are promises to pay money. Their payment and redemption are based on the credit of the State. Then, the final test is, were they put forth as a government puts forth its treasury notes, or a bank its bills, as a substitute for money?

On the 18th of November, 1861,—which is the date of the earliest of these warrants—the Legislature passed two acts which are absolutely conclusive on this point.

One is entitled "An act to provide for the issuance of treasury warrants of small denominations and for the redemption of Arkansas warrants." It requires the Treasurer to issue such warrants and bonds in the sum of one, two and three dollars, at the election of the holder of the Auditor's warrant. And it provides for the conversion of the war bonds into treasury warrants.

The other is entitled "An act to facilitate the circulation of the Arkansas war bonds and treasury warrants." The first section is as follows:

"That hereafter, whenever any judgment or other debtor shall tender in payment the full amount of the judgment or other indebtedness, in Arkansas war bonds or treasury warrants, or war bonds and money, or treasury warrants and money, or war bonds, treasury warrants and money, and the creditor shall refuse to receive the same in full payment of said indebtedness, said failure or refusal shall be sufficient cause to abate any suit thereafter instituted, or to continue any suit already instituted at the date of the tender, or to stay execution upon

judgment until the expiration of two years after such time as peace shall be restored, by treaty or otherwise, between the government of the Confederate States of America and the United States of America.

"Sec. 4. Be it further enacted, That when any party, whose property is subject to sale under legal authority, or process, shall surrender to the officer, or other person authorized to make such sale, an amount of Arkansas war bonds or treasury warrants, or treasury notes, at least equal to the sum, such officer or other person is authorized to collect, that such officer or other person shall receive said bonds or treasury warrants, or notes, and make sale thereof as he would of other personal property, and shall not attempt to sell any other property belonging to such party by virtue of any such authority or process, until after the expiration of two years after the restoration of peace between the Confederate States and the United States."

"Sec. 5. Be it further enacted, That such bonds, warrants, or notes shall not be sold by such officer, or other person, unless said bonds, warrants or notes shall be bid off for at least the amount of the principal and interest specified on the face thereof, and in case said bonds, warrants or notes are not sold, they shall be returned to the party surrendering the same."

A proviso to the eighth section enacts: "That any judgment debtor shall have the right, at his or her own election, to have execution issued against him or her on any judgment now or hereafter to be rendered against him or her in any of the Circuit Courts, or by any justice of the peace, of this State, for the purnose of surrendering in execution war bonds, treasury warrants or treasury notes of this State or Confederate States bonds or treasury notes, in satisfaction of said judgment, upon which the same may issue, and if the said judgment creditor shall refuse to accept from the officer having said execution, said war bonds, treasury warrants or treasury

notes of this State, or of the Confederate bonds and treasury notes of the Confederate States, so surrendered by the judgment debtor, at the par value, including interest due thereon at the time of such surrender, then the said war bonds, treasury warrants, treasury notes, Confederate bonds or Confederate treasury notes shall be returned by said officer to the said judgment debtor, and the said officer having the said execution shall return the same to the proper officer, and the said judgment creditor shall have no further execution or process against said judgment debtor for the period of twelve months after the restoration of peace between the Confederate States and the United States of America." *Session Acts of 1861, pp. 78–9, 43–6.*

In *Ramsey v. Cox, 28 Ark., 369,* and *English v. Oliver, id., 328,* it was decided that the Treasurer's certificates, which were issued under the acts of 1868, 1869 and 1871, and which were made a legal tender in payment of taxes, salaries and fees of all officers, were not bills of credit   The subject does not appear to have been very maturely considered.   But the court could see no indication that the circulation of these instruments as money was enforced by statutory provisions.

It follows that the treasury warrants in suit are not only not receivable for taxes, but they are not even legal obligations of the State.   Nothing herein, however, must be construed into an expression of opinion that no moral obligation rests upon the Legislature to provide for them.   The majority of the claims upon which they were issued are as meritorious as the salaries of the present State officers.   And the holder of the warrants ought to be considered as the equitable assignee, *pro tanto,* of the claims and subrogated to all the rights and equities of the original claimants.

. The judgment is reversed and cause remanded, with directions to sustain the demurrer to the petition.