BROOKS v. SOUTHERN PAC. CO.

(Circuit Court, W. D. Kentucky.   December 31, 1906.)

1. COMMERCE—CARRIERS—FEDERAL EMPLOYERS' LIABILITY ACT—CONSTITUTIONALITY.

Act June 11, 1906, c. 3073, 34 Stat. 232, "relating to the liability of common carriers * * * engaged in commerce between the states * * * to their employés" as stated in its title, and which makes every such carrier liable to any employé or his personal representative for all damages which may result from the negligence of any of its officers, agents, or employés, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways or works, is not a regulation of interstate commerce, but establishes new rules of liability, growing out of the relation of master and servant, which, if valid, are binding on all courts, both state and federal, but which have no such relation to interstate commerce as to bring them within the constitutional power of Congress to regulate such commerce, and the act is, for that reason, void.

2. SAME.

Act June 11, 1906, c. 3073, 34 Stat. 232, which makes every common carrier engaged in interstate commerce liable to any employé, or his personal representative, for all damages which may result from the negligence of

any of its officers, agents, or employés, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, ways or works, if it can be held a regulation of interstate commerce, is still void for want of constitutional authority in Congress to enact it, inasmuch as it is so framed that its provisions are applicable alike to all commerce, including that between citizens of the same state, and cannot be confined to that which is subject to the control of Congress.

8. EXECUTORS AND ADMINISTRATORS—CAPACITY TO SUE IN ANOTHER STATE—KENTUCKY STATUTES.

The personal representative of a decedent qualified in one state cannot sue in another state without authorization by the latter, and Ky. St. 1903, §§ 3878, 3879, which authorize the county court to empower a foreign administrator to sue for "debts" due the decedent cannot be invoked in support of an action to recover damages for a tort.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 22, Executors and Administrators, § 2330.]

At Law. On demurrer to petition.

Wm. M. Smith, J. E. Torrence, and S. C. Bloss, for plaintiff.

Alexander P. Humphrey, for defendant.

Wm. R. Harr, amicus curiæ.

EVANS, District Judge. Morris S. Brooks, a citizen and resident of Kansas, but employed by the defendant as a fireman on one of its locomotives engaged in interstate commerce in the state of Nevada, having been killed in the latter state on June 16, 1906, by the negligence of certain of his fellow servants in the same occupation, the plaintiff, N. C. Brooks, his mother, was qualified as his personal representative by the probate court of Cowley county, Kan. Thereafter she, alleging herself to be a citizen of Kansas, instituted this action against the defendant, a citizen of Kentucky, seeking to recover $25,-000 in damages for the injury to her son, resulting from the alleged negligence of the defendant's employés. The defendant filed a general demurrer to the petition, and the questions thus raised have been elaborately argued.

The Attorney General of the United States, conceiving, we suppose, that the United States had some interest in the case, sent one of his special assistants to intervene on behalf of the government. When the application was made, it was objected by the defendant that this was a litigation strictly inter partes, with which the United States had no concern. The court found it difficult to see how any other conclusion could be reached, and, indeed, in all such cases neither of the parties really interested might desire to be affected by the contentions of any outside person. But, while it is not thought that such a practice should be especially encouraged, inasmuch as there is no statute or law which authorizes or directs the Attorney General to support by arguments in the courts generally the legislation of Congress where the United States is not a party, nor its interests involved in any tangible way, yet the court, desiring light upon the very important questions involved in the case, decided to hear the special assistant of the Attorney General as a friend of the court; but, as both of the parties in interest in the litigation might desire to combat his views if regarded as conflicting with the grounds and arguments upon which they, respective-

ly, might desire to rest the case, the court thought it best that he should speak first, and he did so at length.

Some question was also made as to whether a personal representative qualified in Kansas could sue in any other state without authority from such other state, and some cases would seem to support that contention, but in view of the act of Congress, to which we shall presently allude, and other somewhat obvious considerations, we have con-. cluded that this contention, which was indeed not much pressed, should not at present prevail. Kansas was the domicile of the deceased fireman, and the defendant does not operate its railroad within that state. Being his domicile at the time of his death, that fact, per se, gave jurisdiction to the court there to appoint his administratrix. He was killed in Nevada, and the defendant is a citizen of Kentucky. In neither of those states is it probable that the deceased fireman had any assets to give jurisdiction to the courts of either state for a similar purpose. A mere claim for damages for a tort does not seem to be assets for such purpose. So that from necessity, and in order that the plaintiff may have a remedy which could be enforced against a corporation which did not have a residence in the state of domicile, we are inclined, for the purposes of a suit based on the act of Congress, to treat the plaintiff as the personal representative of Morris S. Brooks within the purview of that act, especially as we think the case ought to be decided upon broader grounds than those which would confine it to the legality of the appointment of the plaintiff. It was expressly conceded at the hearing by plaintiff's counsel that she must succeed, if at all, upon the provisions of the act of Congress relating to the liability of common carriers to their employés, approved June 11, 1906 (34 Stat. 232, 233), which will presently be set out in full. The plaintiff's case, in short, must stand or fall with that act. If it be a valid exercise of legislative power, the plaintiff's right to recover damages is clear if the averments of the petition be true. Otherwise the demurrer must be sustained. The questions involved are therefore of very great and possibly far-reaching importance, and have deserved and received our most careful consideration.

The act referred to is as follows:

"An act relating to liability of common carriers in the District of Columbia and territories and common carriers engaged in commerce between the states and between the states and foreign nations to their employés.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that every common carrier engaged in trade or commerce in the District of Columbia, or in any territory of the United States, or between the several states, or between any territory and another, or between any territory or territories and any state or states, or the District of Columbia, or with foreign nations, or between the District of Columbia and any state or states or foreign nations, shall be liable to any of its employés, or, in the case of his death, to his personal representative for the benefit of his widow and children, if any; if none, then for his parents; if none, then for his next of kin dependent upon him, for all damages which may result from the negligence of any of its officers, agents, or employés, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways, or works.

"Sec. 2. That in all actions hereafter brought against any common carriers to recover damages for personal injuries to an employé, or where such injuries

have resulted in his death, the fact that the employé may have been guilty of contributory negligence shall not bar a recovery where his contributory negligence was slight and that of the employer was gross in comparison, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé. All questions of negligence and contributory negligence shall be for the jury.

"Sec. 3. That no contract of employment, insurance, relief benefit, or indemnity for injury or death entered into by or on behalf of any employé, nor the acceptance of any such insurance, relief benefit, or indemnity by the person entitled thereto, shall constitute any bar or defense to any action brought to recover damages for personal injuries to or death of such employé: Provided, however, that upon the trial of such action against any common carrier the defendant may set off therein any sum it has contributed toward any such insurance, relief benefit, or indemnity that may have been paid to the injured employé, or, in case of his death, to his personal representative.

"Sec. 4. That no action shall be maintained under this act, unless commenced within one year from the time the cause of action accrued.

"Sec. 5. That nothing in this act shall be held to limit the duty of common carriers by railroads or impair the rights of their employés under the safety-appliance act of March second, eighteen hundred and ninety-three, as amended April first, eighteen hundred and ninety-six, and March second, nineteen hundred and three." Act June 11, 1906, c. 3073, 34 Stat. 232, 233.

To determine the questions before us, it is important clearly to understand the exact scope and purport of the act. While the title is not controlling in the construction of an act of Congress, it may aid us in our investigation to note that the title in this instance labels the act as one relating to the liability of certain common carriers to their employés. This label, so to speak, quite accurately describes the contents of the measure, for it in fact does nothing more than fix the liability of certain common carriers to their employés. The first section provides that every common carrier engaged in trade or commerce between the several states shall be liable to any of its employés, or, in the case of his death, to his personal representative for the benefit of his widow, etc., for all damages which may result from the negligence of any of its officers, agents or employés, or by reason of any defect or insufficiency due to its negligence in respect to its cars, etc. This section obviously abrogates the familiar doctrine of the courts, founded upon considerations of public policy, that an employé when entering the service of his employer is conclusively presumed to have assumed the ordinary risks of the occupation, including those which may result from the negligence of his fellow servants. The second section imposes, in complicated form, the doctrine of comparative negligence, so as greatly to modify the ordinary judicial rule that a person cannot recover if, by his own negligence, he so contributed to his own injury as that without it that injury would not have occurred. Other sections further change existing laws in respects which have no present bearing on the discussion. If the act did no more than change the law as administered in the courts of the United States, and so as to control only cases pending therein, the right to do so by appropriate legislation might not be open to question, as mere judicial rules founded on the common law or upon considerations of public policy, but having all the force of law, are no more sacred than legislative enactments, which may be altered or repealed at the will of Congress; but its title and first section elaborately and unmistakably show that the scope

of the act in question is immeasurably different, and Congress obviously intended it to be so. If the act be valid as a regulation of commerce, which is all that was claimed for it at the argument, and doubtless all that can fairly be claimed for it in any event, it is the supreme law of the land of general application, and as such is binding upon all courts —state and federal—and fixes imperative rules by which all of them must hereafter be governed.

It is manifest that legislation of that scope, namely, legislation designed to regulate commerce, must find its warrant in article 1, § 8, of the Constitution of the United States, which, for the purposes of this discussion, is in this language:

"The Congress shall have power," among other things, " * * * to regulate commerce with foreign nations and among the several states and with the Indian tribes," and "* * * to make all laws which shall be necessary and proper for carrying into effect the foregoing powers."

As we recently had occasion to point out, the construction of the last of these clauses is governed by the rule laid down in the opinion of the court in McCulloch v. Maryland, 4 Wheat. 421, 4 L. Ed. 579, which, while showing that constitutional limits are not to be transcended, also holds that in regulating commerce the National Legislature must have large discretion in carrying into execution the high powers conferred upon it in the manner most beneficial to the people, and if the end be legitimate and the act within the scope of the Constitution, then that all means which are appropriate, which are plainly adapted to that end, and which are not prohibited, but which consist with the letter and spirit of the Constitution, are constitutional.

Upon the legislation now under discussion two questions arise, each of them of vital importance. The first is whether the subject-matter of the act, namely, the creation and enforcement of liabilities growing out of the negligence of certain common carriers to their employés, is a regulation of commerce among the states within the meaning of that phrase in the Constitution; and the second is whether the act, if it does regulate commerce among the states, does not also regulate commerce that is exclusively within the several states, and whether the latter is not so inseparably combined with the former as to condemn the whole act as unwarranted by the Constitution. In the opinion delivered in the case of United States v. Scott, 148 Fed. 431, we recently had occasion to discuss similar questions, and need not repeat now much of what was said then, though we have industriously re-examined the whole subject.

Having found that the act of June 11, 1906, is not limited, and manifestly was not intended to be limited to the purpose of changing certain rules of law administered in the federal tribunals in suits for damages pending therein, but was designed to operate as a regulation of commerce under the clause of the Constitution referred to, we come to the first of the questions, viz.: Whether the act can fairly and properly be considered as a regulation of commerce in any sense. Obviously the first inquiry is whether an act, strictly limited as this is to fixing liability to their employés of such common carriers as are engaged in interstate commerce, is a regulation of such commerce; that is to say, does it prescribe a rule for carrying on commercial intercourse

among the states, which seems to be the essential requisite in such legislation? The solution of that question may, and probably must, depend upon whether a rule of liability for injuries is or by any reasonable probability can be regarded as commerce or a rule for carrying it on in any sense whatever, either as the word is used in the Constitution or otherwise. Commerce has been described by the Supreme Court in many cases, from 1824, in Gibbons v. Ogden, 9 Wheat. 189, 6 L. Ed. 23, down to very recent times, but it has never been deemed desirable to give the word any hard and fast definition in view of the great changes constantly occurring in the business affairs of the world. It may help us to note that Webster defines commerce to be "the exchange or buying and selling of commodities, especially the exchange of merchandise on a large scale between different places or communities; extended trade or traffic." In Gibbons v. Ogden, it was said that commerce is more than traffic; it is intercourse, and that it is regulated by prescribing rules for carrying on that intercourse. In many cases it has been held by the Supreme Court that commerce includes navigation and transportation of both persons and property, as well as traffic generally, and all the cases agree in treating the word "commerce" as one of large and extensive meaning. In Hopkins v. United States, 171 U. S., at page 597, 19 Sup. Ct., at page 47 (43 L. Ed. 290), speaking through Mr. Justice Peckham, the court said:

"Definitions as to what constitutes interstate commerce are not easily given so that they shall clearly define the full meaning of the term. We know from the cases decided in this court that it is a term of very large significance. It comprehends, as it is said, intercourse for the purposes of trade in any and all its forms, including transportation, purchase, sale, and exchange of commodities between the citizens of different States, and the power to regulate it embraces all the instruments by which such commerce may be conducted. Welton v. Missouri, 91 U. S. 275, 23 L. Ed. 347; Mobile County v. Kimball, 102 U. S. 691, 26 L. Ed. 238; Gloucester Ferry Company v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158; Hooper v. California, 155 U. S. 648, 653, 15 Sup. Ct. 207, 39 L. Ed. 297; United States v. E. C. Knight Company, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325."

And the instruments by which commerce may be carried on necessarily vary as improvement and invention expand the opportunities and facilities therefor. Many cases might be cited showing the various applications of the word "commerce" to existing instrumentalities of traffic, but it is not deemed necessary to elaborate that phase of the discussion. Certainly section 8, art. 1, of the Constitution gives Congress the power to regulate commerce among the states; and, as we have seen, it may do this by any law which is appropriate and plainly adapted to that end, and which is within the scope and consistent with the letter and spirit of the Constitution—conditions of great moment which cannot be overlooked. While the courts would be exceedingly slow to inquire into the mere appropriateness of legislation, they cannot decline the duty of inquiring whether legislation is within the constitutional power of Congress when a proper case demands the investigation, and a most patient consideration of the question in this instance has led us to the conclusion—we think to the inevitable conclusion—that the act of June 11, 1906, only creates and imposes a liability upon certain common carriers to their employés, and in no way prescribes

rules for carrying on traffic or commerce among the states, and consequently in no way regulates such commerce. If the operation of the act could in any wise affect commerce among the states, it would do so in a manner so remote, incidental, and contingent, as in no proper sense to afford a factor of any value in determining the question now in contention. With what the Supreme Court has said in many cases before us, and with an open Constitution to control, we should be trifling with important things if we gave force to any other conclusion. Indeed, it may be said that it is obvious that Congress, in the act referred to, had in contemplation no more than the creation of the liability mentioned, and it would be a most strained construction to hold that it included anything broader than that. Creating new liabilities growing out of the relations of master and servant on the one hand, and regulating commerce on the other, are two things so entirely different that confusion of the judicial mind upon them is hardly to be expected under normal conditions. In the opinion of the court the act does not regulate commerce among the states. While congress seems to have desired in this instance to exert the power given by the Constitution for that purpose, it, in fact, regulated something which is not commerce at all.

2. But if we are in error in the conclusion that the act when properly considered does not "regulate commerce among the states," there yet remains to be considered the second of the questions above stated, namely, whether the act, if it does regulate commerce among the states, does not also equally regulate commerce that is exclusively within the several states, and thereby embrace, not only matters which are constitutional, but also those which are unconstitutional in a way to make the two indivisible, and to bring the entire act under condemnation when subjected to well-established rules of construction. But, before entering upon a discussion of this last question, it may not be inappropriate to recall the trite, but transcendently important, proposition that, while the powers given to Congress are to be fairly and even liberally construed, especially in respect to the commerce clause of the Constitution, yet those powers have a limit beyond which Congress cannot legitimately go. We should not grow restive under the restrictions and limitations of that great instrument, for the stability of our institutions largely depends upon their enforcement, and so great is our respect for the legislative branch of the government that we shall always regard any overstepping of those bounds by that body to have been an inadvertence. This the courts can and should correct when they come to look more critically into the subject than Congress had probably had the opportunity to do.

In the Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, the Supreme Court had before it in concrete form the second question to which we have just referred. The following syllabi prefixed to the report of that case clearly and accurately summarize the points decided, and present at once and in succinct form the propositions of law upon which the question now under discussion must turn:

"If an act of Congress can in any case be extended, as a regulation of commerce, to trade-marks, it must be limited to their use in 'commerce with foreign nations, and among the several States, and with the Indian tribes.' The legis-

lation of Congress in regard to trade-marks is not, in its terms or essential character, a regulation thus limited, but in its language embraces, and was intended to embrace, all commerce, including that between citizens of the same state.   That legislation is void for want of constitutional authority, inasmuch as it is so framed that its provisions are applicable to all commerce, and cannot be confined to that which is subject to the control of Congress."

Sutherland, in his work on Statutory Construction (section 169), says:

"In this country legislative bodies have not an unlimited power of legislation.   Constitutions exist which contain the supreme law.   Statutes which contravene their provisions are void.   Courts have power, and they are charged with the judicial duty, to support the constitutions under which they act against legislative encroachments.   They will declare void acts which conflict with paramount laws."

And in section 170, he states the general principle applicable to this case, as follows:

"It may be laid down generally as a sound proposition that one part of a statute can not be declared void and leave any other part in force. unless the statute is so composite, consisting of such separable parts that, when the void part ·is eliminated, another living, tangible part remains, capable by its own terms of being carried into effect, consistently with the intent of the Legislature which enacted it in connection with the void part.   If it is obvious that the Legislature did not intend that any part should have effect unless the whole, including the part held void, should operate, then holding a part void invalidates the entire statute."

The text of the author is supported by many cases, state and federal, cited in his notes.

The general doctrine has been reannounced in numerous cases by the Supreme Court.   In Baldwin v. Franks, 120 U. S. 686, et seq., 7 Sup. Ct. 656, 763, 32 L. Ed. 766, it was much emphasized, as it also had been in previous cases.   And that there is no disposition to change this thoroughly established rule was unmistakably manifested when the Supreme Court, on the day on which this case was argued, in Illinois Central R. R. v. McKendree, 27 Sup. Ct. 153, 51 L. Ed. ——, held that an order of the Secretary of Agriculture regulating quarantine was void, because too broad in its scope, and, speaking through Mr. Justice Day, said:

"The terms of Order 107 apply to all cattle transported from the south of this line to parts of the United States north thereof.   It would, therefore, include cattle transported within the state of Tennessee from the south of the line as well as those from outside that state.   There is no exception in the order, and in terms, it includes all cattle transported from the south of the line, whether within or without the state of Tennessee.   It is urged by the government that it was not the intention of the Secretary to make provision for intrastate commerce, as the recital of the order shows an intention to adopt the state line, when the state by its Legislature has passed the necessary laws to enforce the same completely and strictly.   But the order in terms applies alike to interstate and intrastate commerce.   A party prosecuted for violating this order would be within its terms if the cattle were brought from the south of the line to a point north of the line within the state of Tennessee.   It is true the Secretary recites that legislation has been passed by the state of Tennessee to enforce the quarantine line, but he does not limit the order to inter-·state commerce coming from the south of the line; and, as we have said, the order in terms covers it.   We do not say that the state line might not be adopted in a proper case, in the exercise of federal authority, if limited in its effect to interstate commerce coming from below the line, but that is not the

148 F.—63

present order; and we must deal with it as we find it. Nor have we the power to so limit the Secretary's order as to make it apply only to interstate commerce, which it is urged is all that is here involved. For aught that appears upon the face of the order, the Secretary intended it to apply to all commerce, and whether he would have made such an order, if strictly limited to interstate commerce, we have no means of knowing. The order is in terms single, and indivisible."

After quoting from United States v. Reese, 92 U. S. 221, 23 L. Ed. 563, and from the Trade-Mark Cases, 100 U. S. 99 (25 L. Ed. 550), the court added:

"We think these principles apply to the case at bar, and that this order of the Secretary, undertaking to make a stringent regulation with highly penal consequences, is single in character, and includes commerce wholly within the state, thereby exceeding any authority which Congress intended to confer upon him by the act in question, if the same is a valid enactment."

With this perfectly plain rule before us, we must, by its requirements, test the act of June 11, 1906, which, we repeat, provides that "every" common carrier engaged in interstate commerce shall be liable to "any" of its employés, or in case of his death to his personal representative, for "all" damages which may result from the negligence of "any" of its officers, agents or employés, or by reason of "any" defect or insufficiency due to its negligence in its cars, etc. Language could hardly be broader or more comprehensive in its scope. Argument was made attempting to show that the language should be construed to create a liability only where the employé was at the time of the injury engaged upon interstate commerce; but the words of the statute are plain and unambiguous, and, if they admit of any construction, it clearly does not admit of the one contended for. On the contrary, as already emphasized, that language expressly is that every such common carrier shall be liable to any of its employés for all damages which may result from the negligence of any of its employés or by reason of any defect in cars, etc. The rule is elementary that where language is plain it admits of no construction, but must be taken in its obvious signification, and to mean what it says. The act in question was attempted to be likened to that of March 2, 1893, usually known as the "Safety Appliance Act"; but, in all the respects with which we are concerned, the provisions of the latter act are wholly different from those of the former, as will at once be seen by comparing section 1 of the safety appliance act with section 1 of the act of June 11, 1906. Section 1 of the former provides that it "shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic which is not equipped, etc., * * * or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped," etc. Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]. This comparison at once makes manifest the difference between the two acts. No doubt it is for this reason that small question has ever been made as to the constitutionality of the safety appliance act.

Furthermore, the act of June 11, 1906, obviously includes all of the employés of every common carrier which is engaged in interstate commerce, whether the employé is so engaged or not. If the common carrier be itself engaged in interstate commerce as part of its business,

it is wholly immaterial, under the terms of the act, whether an injured employé was ever so engaged. Take as an illustration near home: The Louisville & Nashville Railroad Company has an important branch which only extends from Louisville, on the northern border of the state, to Lexington, near its center, and the business of that branch is necessarily for the most part confined to commerce entirely in Kentucky. That company also has very large shops in Louisville, at which it employs a very great number of servants. Its general offices are here, in which are many clerks. The duties of most of these employés, namely, those in its shops and general offices, cannot possibly have any direct relation to interstate commerce, and those of many of them can have no relation to interstate commerce at all. Yet the enactment that every common carrier engaged in interstate commerce shall be liable to any of its employés for all damages resulting from the negligence of any of its officers, agents, etc., embraces all of the employés of that common carrier, whether or not those employés have anything to do with interstate commerce. So, with a common carrier who might use horses and wagons in a general business which might embrace the carriage of merchandise, say between St. Louis, Mo., and East St. Louis, Ill., or between Louisville, Ky., and New Albany, Ind. Now, although small proportions of the carrier's business might be interstate and much the greater part be confined locally to St. Louis in one instance or to Louisville in the other, yet, as those common carriers were respectively and to some extent actually engaged in interstate commerce, the act of June 11, 1906, would impose upon them the liability it creates, even though one of their employés might be injured in conducting the purely local business of the carrier, and whether or not he ever had anything to do with interstate commerce.

An intelligent consideration of the authorities will lead, we think necessarily, to the conclusions, first, that even if the act regulates commerce in any possible constitutional sense it is too broad and applies not only to interstate commerce, but also to that which is entirely within the states, respectively; and, second, that the provisions of the act in these respects are single and altogether inseparable, the one from the other. Even if some part of the act might be sustained if it stood alone, yet, as all its parts are inseparably connected, all must fall if any should do so. The applicable rule is well established, and we do not have to go far for the reason upon which that rule is based. It is this: It cannot be presumed that Congress, when it so joined them together, meant to pass or would have passed either of them separately. In its opinion, in Baldwin v. Franks, 120 U. S., at page 687, 7 Sup. Ct., at page 660 (32 L. Ed. 766) the court, quoting from its opinion in the Trade-Mark Cases, said:

" 'While it may be true that when one part of a statute is valid and constitutional, and another part is unconstitutional and void, the court may enforce the valid part, where they are distinctly separable, so that each can stand alone, it is not within the judicial province to give to the words used by Congress a narrower meaning than they are manifestly intended to bear, in order that crimes may be punished which are not described in language that brings them within the constitutional power of that body.' And again, further on, after citing United States v. Reese, and quoting from the opinion in that case, it was said, page 99 of 100 U. S. (25 L. Ed. 550): 'If we should, in the case

before us, undertake to make by judicial construction a law which Congress did not make, it is quite probable we should do what, if the matter were now before that body, it would be unwilling to do, namely, make a trade-mark law which is only partial in its operation, and which would complicate the rights which parties would hold, in some instances under the act of Congress, and in others under state law.'

"The same question was also considered and the former decisions approved in United States v. Harris, supra; and in the Virginia Coupon Cases, 114 U. S. 270, 305, 5 Sup. Ct. 903, 29 L. Ed. 185, it was said that to hold otherwise would be to substitute for the law intended by the Legislature one they may never have been willing by itself to enact.'"

This rule is also clearly stated in the opinion in Illinois Central R. R. Co. v. McKendree, and the subject has often been so treated by the state courts in cases which are collected in Sutherland in the work referred to in sections 169 to 174 inclusive. Furthermore, it may be remarked that in several instances the Supreme Court has held that city ordinances imposing taxes on telegraph companies were void or not void as they differentiated a tax on interstate business from one on state or local business alone. See Leloup v. Port of Mobile, 127 U. S. 640, 8 Sup. Ct. 1380, 32 L. Ed. 311, and cases cited. In short, the Constitution of the United States, which firmly fixes our form of government, gives Congress the power to regulate interstate commerce, but leaves to the states, respectively, the exclusive power of regulating that comerce which is carried on altogether within the limits of a state. Here the congressional enactment attempts, through the same provisions, to regulate commerce generally, including both interstate commerce and that which is purely local to the states. It consequently embraces matters which are within and matters which are not within the reach of congressional power, and, as the matters which are within congressional competency are inseparably combined with those which are not, no part of the act can be sustained. Not because they were difficult, but because of widespread interest in the questions involved in this case, we have stated, probably with more than necessary fullness, the grounds of our decision, which we rest upon the two propositions discussed, and thereupon hold that the act of June 11, 1906, is invalid.

3. This conclusion, however, may possibly leave another question open, which is this: With the act eliminated, is a cause of action otherwise disclosed by the plaintiff's petition in this action by a citizen of Kansas against a citizen of Kentucky? The cause of action arose in Nevada. At the common law, of course, no action for damages would lie in favor of an administrator where the injury had resulted in death. Such right always must depend upon some statutory enactment. The legislation of Nevada upon the subject is found in the act of March 24, 1905, amending section 3983 of the compiled laws of that state. Laws 1905, p. 254; c. 148. The right to sue given by that statute to the personal representative seems to be made to depend upon the strict condition that the action shall be brought in Nevada, and not elsewhere. This condition renders it more than probable that the right of action given by the statute is not transitory, because the right is given only where the suit is brought in Nevada. But, assuming that the action may be considered transitory in the general sense, we are then con-

fronted with decisions like those in Noonan v. Bradley, 9 Wall. 400, 19 L. Ed. 757, and Maysville, etc., Co. v. Marvin, 59 Fed. 91, 8 C. C. A. 21, which rule that a personal representative qualified in one state cannot sue in another state without the latter's authorization. In the last-named case it was distinctly held by the Circuit Court of Appeals of this circuit that a claim for damages for tort will not support an exercise of the power given under sections 3878 and 3879 of the Kentucky Statutes of 1903, which authorize the county court to empower a foreign administrator to sue for "debts" due the decedent. This decision was in accord with the doctrine of the Kentucky Court of Appeals in construing the statutes of that state. And, of course, if the act is eliminated, it is obvious that the petition is insufficient, because on its face it shows that the injuries of the deceased resulted from the negligence of his fellow servants.

So that, from every point of view, the judgment of the court must be that the plaintiff has not manifested by the averments of her petition any right to recover in this action. The demurrer is therefore sustained, but, as required by the Kentucky Code, she will be given leave to amend her pleading, if so advised.