## AMERICAN AGRICULTURAL CHEMICAL CO. v. MOORE, State Commissioner of Agriculture and Industries.

(District Court, M. D. Alabama, N. D. at Montgomery.  January 22, 1927.)

No. 366.

1. Courts ⬤➡303(3)—Suit against state commissioner of agriculture and industries to secure registration of trade-mark is not suit against state (Const. U. S. Amend. 11).

Suit against state commissioner of agriculture and industries to secure registration of trade-mark or trade-name used in sale of commercial fertilizer is not, in effect, a suit against the state such as is forbidden by Const. U. S. Amend. 11.

2. Agriculture ⬤➡7—Action of state commissioner in refusing to register trade-mark for commercial fertilizer is subject to judicial control.

Action of state commissioner of agriculture and industries in refusing permit for registration of trade-mark or trade-name used in sale of commercial fertilizer is subject to judicial control, since he is vested only with quasi judicial function of prohibiting registration and sale of any fertilizer or fertilizer material with misleading or deceptive trade-marks or brand names.

3. Evidence ⬤➡457—In case of conflict, court will hear evidence to determine meaning of word in its common or accepted or asserted significance.

Where there is a conflict between etymological meaning of a word or phrase and its common or asserted significance as applied to article of trade or commerce, courts will hear evidence to determine how it is in fact understood when used in that connection.

4. Constitutional law ⬤➡72—Court must intervene and protect property rights, where public official, under color of office, would wrongfully injure or destroy them.

When public official exceeds authority or duty, and under color of office wrongfully injures or destroys valuable property rights; it becomes duty of court to intervene and protect those rights.

5. Trade-marks and trade-names and unfair competition ⬤➡23—Trade-mark, becoming of pecuniary value or business advantage, is "property right," and entitled to protection of courts.

Any trade-mark or trade-name, not unlawful in itself or against public policy, which has become of pecuniary value or business advantage, becomes property right, and, as such, is entitled to protection afforded by the courts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Property Rights.]

6. Action ⬤➡65—Rights of parties are to be adjudicated by facts existing at time of filing of bill.

Rights of parties are to be adjudicated by facts as they exist at time of filing of bill, and not what may have occurred at some remote period.

7. Agriculture ⬤➡7—Use of word "Sea Fowl" with picture of bird on commercial fertilizer held not deceptive or fraudulent.

Printing of name "Sea Fowl," with picture of bird, on bags containing commercial fertilizer, held not deceptive or fraudulent, so as to authorize refusal to register trade-mark or trade-name, in view of evidence that product was known by consuming public as being mixed artificial or manufactured product, and not natural fertilizer known as Peruvian guano.

In Equity.  Suit by the American Agricultural Chemical Company against J. M. Moore, individually and as Commissioner of Agriculture and Industries of the State of Alabama.  Judgment for plaintiff.

P. W. McQuillen (of Sullivan & Cromwell), of New York City, and Steiner, Crum & Weil, of Montgomery, Ala., for plaintiff.

Harwell G. Davis, Atty. Gen., and A. A. Evans, Asst. Atty. Gen., for defendant.

CLAYTON, District Judge.  The jurisdiction of this court is invoked by the plaintiff, a Connecticut corporation, to restrain the defendant, individually and as the commissioner of agriculture and industries of the state of Alabama, from an alleged arbitrary and unwarranted refusal of such commissioner to permit the registration of the plaintiff's trade-mark or trade-name used in the sale of commercial fertilizer.

Summarizing the bill of complaint, the plaintiff is, and for many years has been, engaged in the manufacture of commercial fertilizer composed of various ingredients appropriate and valuable for that purpose, and had sold in the state of Alabama and throughout the southern territory under brands and trade-names which had been registered in accordance with the laws of the state from year to year from the inception of its business.  About the year 1868 plaintiff's predecessor in interest began the manufacture and sale of fertilizer composed of ingredients blended according to private formula, put up in bags, upon which were printed or stamped the fanciful name, "Sea Fowl," and on which bags was printed the picture of a duck or sea fowl, accompanied by the statement on each bag in large type, "Manufactured by the American Agricultural Chemical Co., Montgomery, Ala.," together with the print of the guaranteed analysis.

This name and sign had been continuously used by the plaintiff's predecessor in interest until about 1911, when plaintiff acquired the fertilizer business and property rights, including the trade-names, etc., and had continued without interruption the manufacture and sale of fertilizer under that name or brand to the present time. Such brand had been registered in accordance with the laws of the state of Alabama since the enactment of the statute requiring registration, and about the year 1917 plaintiff caused its said brand to be registered in the United States Patent Office. Plaintiff and its predecessor in interest, through extensive advertisement, and by virtue of the excellence of its product, had built up a large and valuable trade, which had become a property right of great worth. Under the laws of the state of Alabama then in force, all manufacturers of commercial fertilizers sold in the state were required to first register with the commissioner of agriculture, upon forms furnished by him, the name and address of the manufacturer, the name of each brand of fertilizer and fertilizer materials or chemicals, with the guaranteed analysis thereof, and the source within 10 per cent. of each material from which phosphoric acid, nitrogen, potash, and filler were derived, and the minimum percentages of available phosphoric acid, nitrogen, and potash, and to renew such registration each year, such act making it unlawful, under penalty of subjecting such goods to confiscation, for offering them for sale without being registered as required, and each bag or package was required to have affixed thereto a tag or label stating the net weight, the name or trade-mark employed, and the guaranteed analysis of the content. The statute provides that the commissioner "shall have authority to prohibit the registration and sale of any fertilizer or fertilizer material with misleading or deceptive trade-marks or brand names, or carrying exaggerated claims, or containing material injurious to growing plants." Laws 1923 Ala. p. 436, § 8.

It is alleged that the plaintiff made application to the commissioner for the registration of said brand or trade-name "Sea Fowl" for the year 1925, but the commissioner, acting in reliance upon the statute, had declined to allow such registration, because he "considered it misleading and deceptive upon the ground that it was not known to him to contain Peruvian guano as the source of 65 per cent. or more of its nitrogen content," although the plaintiff had in all respects complied with the law of the state by furnishing the requisite certificates, etc.

The plaintiff insists that this action of the commissioner was arbitrary and unwarranted, and, in effect, amounted to the destruction of its business and valuable property rights built upon its trade-mark and name; and therefore, as a result of such action, it would suffer irreparable injury.

The prayer of the bill is that the defendant and agents be restrained from prohibiting the registration of such brand or tradename, and from refusing to accept the statement for registration prepared and tendered by the plaintiff, and to prevent the prohibition of the sale of the plaintiff's product because offered for sale under the plaintiff's long-established trade-name or brand.

Preliminary injunction was granted; and the cause is now submitted upon the plaintiff's motion for permanent injunction. The averments of the bill, which have been stated, are without material dispute, and are supported by the testimony, oral and documentary, heard and considered at the trial.

The first objection interposed to the relief prayed for is that the suit is in effect one against the state, forbidden by the Eleventh Amendment to the Constitution; and that the statute invests the commissioner with a discretion which is not subject to judicial control; and, further, that the brand or trade-name involved is upon its face deceptive and misleading.

[1, 2] The courts have so frequently considered the objection first above stated, and have so often decided it against the defendant's contention, that it is not now open to controversy. The defendant's official position as commissioner does not place him beyond the reach of equitable power. He must act under the color of his official position, and, if his conduct is unwarranted or arbitrary, he is not exempt from the process of a court of equity.

In the very recent case of Old Colony Trust Co. v. City of Seattle, 271 U. S. 426, loc. cit. 430, 431, 46 S. Ct. 552, 554 (70 L. Ed. 1019) wherein the power of the state taxing authorities was involved, and the point was made that the suit was in effect a suit against the state, the court used this pertinent language: "In short, the charge was that the defendants were wrongfully and abusively using the process of collection for a purpose and in a mode at variance with applicable legal and equitable principles and hurtful to the plaintiff. We think it apparent from this review of the bills that the suit was not in name or in effect a suit against

the state, but only a suit against state agents to restrain them from wrongful acts threatened and attempted under color of their agency."

And, quoting from Hopkins v. Clemson Agri. College, 221 U. S. 636, 31 S. Ct. 654, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243, said: "But immunity from suit is a high attribute of sovereignty—a prerogative of the state itself—which cannot be availed of by public agents when sued for their own torts. The Eleventh Amendment was not intended to afford them freedom from liability in any case where, under color of their office, they have injured one of the state's citizens. To grant them such immunity would be to create a privileged class free from liability for wrongs inflicted or injuries threatened. Public agents must be liable to the law, unless they are to be put above the law."

To the same effect are Scully v. Bird, 209 U. S. 481, 28 S. Ct. 597, 52 L. Ed. 899; Crescent Mfg. Co. v. Mickle (D. C.) 216 F. 246, a case in which the state dairy and food commissioner was restrained from interfering with the sale in the state of a baking powder made by the plaintiff, which the defendant considered to be adulterated and improperly labeled under the Oregon law. Coca Cola Co. v. Koke Co., 254 U. S. 143, 41 S. Ct. 113, 65 L. Ed. 189, a case quite in point, in which the court held that the acts and conduct of the official complained of were subject to judicial review and control; Dearborn Publishing Co. v. Fitzgerald (D. C.) 271 F. 479; Coca Cola Co. v. Stevenson (D. C.) 276 F. 1010; Palmetto Fire Ins. Co. v. Conn, Superintendent of Insurance of Ohio (D. C.) 9 F.(2d) 202; Hopkins v. Clemson Agri. College, supra; Poindexter v. Greenhow, 114 U. S. 270, 5 S. Ct. 903, 962, 29 L. Ed. 185; Philadelphia Co. v Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570; Johnson v. Lankford, 245 U. S. 541, 38 S. Ct. 203, 62 L. Ed. 460.

In the Dearborn Case, supra, the authorities of the city of Cleveland undertook to prohibit the sale and distribution of what was deemed by them a scandalous publication, tending to create breaches of the peace. They insisted they were in the exercise of their discretion under city ordinances. The court, passing upon the merits, held that the acts of the officials were not justified under the facts, and the fact that they were in good faith constituted no defense to the bill.

In this case the statute simply provides that the commissioner "shall have authority to prohibit the registration and sale of any fertilizer or fertilizer material with misleading or deceptive trade-marks or brand names." If the mark or brand is in fact not misleading or deceptive, then he has no authority to interfere with its use. He is vested with a quasi judicial function of deciding a fact, and, if his decision is unwarranted, then he is exercising no longer the faculty of judgment, but the faculty of will, and in such condition it cannot be doubted that his acts are subject to review by the courts. If this were not so, then most valuable property rights could be easily destroyed without even the consideration of any evidence at all.

[3] It is familiar that, if there is a conflict between the etymological meaning of a word or phrase and its common or accepted or asserted significance, as applied to an article of trade or commerce, the courts will hear evidence to determine how it is in fact understood when used in that connection. This is clearly supported by the trend of modern decisions. Coca Cola Co. v. Koke Co., supra; LeBlume Import Co. v. Coty (D. C.) 292 F. 264; Lambert Pharmacal Co. v. Bolton Chemical Co. (D. C.) 219 F. 325. This principal was applied in the famous whisky decision by President Taft in 1909, wherein it was referred to a commissioner to ascertain from the testimony of competent witnesses, familiar with the trade, the meaning of the word "whisky," as used in that trade.

The evidence was taken in open court, and was without material conflict, and supports the averments of the bill. There were many witnesses from various sections of the state—men of high character—some of them dealers and some farmers, who testified that they had used this brand of fertilizer for years, and were fully aware that they were using a manufactured fertilizer; that they knew this not only from the brand or design so long in use, but from the tag also, and as well from the character of the goods. They affirmed the excellence of the quality of the fertilizer, and testified, in effect, that such excellence was the chief inducement for its use. It did not appear that any one had been deceived or misled, or had assumed from the brand or otherwise, that the fertilizer was a natural bird manure or Peruvian guano. Nor did it appear that any such complaint had been made to the commissioner. Evidently his action was of his own motion. One of the leading experts in the field of fertilizer chemistry—an independent consulting chemist having no connection with the plaintiff—testified to the high quality of the goods and the rightful use of the name or brand, basing his testimony upon his ex-

perience of over a quarter of a century, his analysis of the goods, and his knowledge of agricultural conditions. It was also shown that fertilizer under this brand had been continuously sold for half a century in Alabama, and that the sales in such territory had grown until in the year 1925 they had reached a half million dollars or more. Further that, while the plant handled fertilizers under other brands, the Sea Fowl constituted about 60 per cent. of its business in the Alabama territory. It was also established that a product from the islands of Peru, constituted of bird deposits and the decayed carcasses and feathers of sea birds, was at one period sold in the United States, but sold under and only under the name of Peruvian guano, and at a much higher price than that now commanded by manipulated commercial fertilizers; that such Peruvian guano was well known and understood in the trade; and that there was no reasonable probability of the plaintiff's goods being mistaken for Peruvian guano or the natural deposits of birds. The evidence is convincing that the plaintiff's product was, and had for many years been, known by the consuming or using public to be a mixed artificial or manufactured product sold under a mere fanciful name. Undoubtedly, the plaintiff has a valuable property right in its trade-name, and the court cannot permit the destruction of that right, as no substantial or justifying reason can be found.

[4, 5] I am not unmindful of the duty of the court in being cautious of interfering with the actions of public officials, but, when the official exceeds his authority or duty, and under the color of his office would wrongfully injure or destroy valuable property rights, it becomes the duty of the court to intervene and protect those rights. The good will in business is a valuable asset, and in modern commercial life it is frequently built upon a trade-name. Any trade-mark or name not unlawful in itself nor against public policy, which has become of a pecuniary value or a business advantage, becomes a property right, and, as such, is entitled to the protection afforded by the courts.

In his recent and admirable treatise, the Historical Foundations of the Law Relating to Trade-Marks, Frank I. Schechter, A. M., J. D. of the New York Bar, quoting from authorities, says: "A large part of what is most valuable in modern life seems to depend more or less directly upon 'probable expectancies.' It would seem to be inevitable that courts of law, as our system of jurisprudence is evolved to meet the growing wants of an increasingly complex social order, will discover, define, and protect from undue interference more of these 'probable expectancies.' Among these 'probable expectancies' which courts of law are being called upon with ever increasing frequency to define and protect is good will, i. e., the expectation of the trader or manufacturer that he will be undisturbed in the custom or trade which the merits of his wares or the ingenuity of his advertising have attracted from the consuming public."

In Union Pacific R. R. v. Chicago, R. I. & P. R. R. Co., 163 U. S. 600, 16 S. Ct. 1173, 41 L. Ed. 278, the court used this trite language with respect to the flexibility of courts of equity to conform to modern business relations. "It must not be forgotten that in the increasing complexities of modern business relations equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies 'so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated;' and 'has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising and new kinds of wrongs are constantly committed.'"

It was suggested by the defendant in the argument that many years ago, some 40 or more, plaintiff's predecessor had used advertising matter in connection with the sale of its Sea Fowl guano, or fertilizer, carrying a fanciful design, indicating, or intended to indicate, that the product was a Peruvian guano or bird deposit, and that probably the sale of the plaintiff's product was built upon a false basis, but there was no substantial evidence to support the suggestion.

[6] Suffice it to say that the rights of the parties are to be adjudicated by the facts as they existed at the time of the filing of the bill, and not by what may or may not have occurred at some remote period. Coca Cola Co. v. Koke Co., supra.

[7] It must be said that the print, including the picture of a bird, the analysis of the content, and the statement that the fertilizer was manufactured at Montgomery, Ala., put on the plaintiff's fertilizer containers or bags, is not deceptive or fraudulent. It is common in trade nowadays to have the pic-

ture of an ox or something similar branded on commercial fertilizers containing a small amount of animal blood. The picture of a red steer printed on a bag of fertilizer would not lead even a dolt to believe that the content was that of an ox ground up, flesh, blood, and bone, and all dehydrated and pulverized, and reduced to the form of available plant food. It is not unusual for the picture of a hen and a basket full of eggs or similar emblems to be printed on chicken feed containers. I do not think such trade-marks could be regarded as so deceptive as to lead any man or woman of ordinary observation and not deprived of common sense into believing that every hen, on account of being fed the content, would lay a sufficient number of eggs to fill the bushel basket. To think such would be the result would be to draw on an exaggerated imagination, for it would not be possible, even with the greatest wear of machinery, for the hen to produce so much fruit. The list of attractive trade-marks or signs adopted and used by the manufacturers of various products can be multiplied. The practice is legitimate. In the case at bar it is clearly stated on each container that the fertilizer is a product manufactured at Montgomery, and of the guaranteed analysis. The commissioner found fault with the plaintiff's brand, because the plaintiff did not omit from the print the trade-name "Sea Fowl" and the picture of the bird, referred to in the pleadings as a duck or sea fowl, which in fact appears to be the likeness of an albatross. It has not been shown that anybody has ever been deceived by the words or picture printed on the containers of the plaintiff's product, a popular brand of commercial fertilizer. It was suggested on the hearing that the brand or picture might possibly deceive one into believing that the product was derived from the deposits of sea fowl, but the evidence clearly showed that no consumer had been so deceived or defrauded.

In my opinion, the objection to the registration of the brand is without merit; it is meticulous. I think it just to treat the status of this case as in the indicative, and have, therefore, declined to conjugate it into the subjunctive mood, that the brand, including the picture, analysis, the words showing it is a manufactured product, and the place of manufacture, might in some merely possible instance, but not probable, deceive some one. Such notion of possible deception seems to be, in the light of the evidence, a draft on the imagination, and a reflection upon people who exercise ordinary observa-

tion, and upon farmers and other consumers who can read and understand plain words of the English language.

It is also to be said that the plaintiff's product is a good commercial fertilizer, and that the printed formula shows that the chemical analysis of the three principal ingredients of plant food, phosphoric acid, nitrogen, and potash, are of a higher percentage in the plaintiff's compound than what is usually shown in ordinary standard commercial fertilizer, 8–2–2.

The commissioner and his department are to be commended for the good work that has been accomplished and their vigilant exercise of care to prevent the sale of worthless and inferior fertilizers to farmers and other users, but authority has been exceeded in this instance.

My judgment is that the plaintiff is entitled to the relief prayed for; therefore permanent injunction will be decreed.